**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| THE JOHN ALLAN COMPANY, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION NO. 05-CV-1150-MLB |
| | ) |
| v. | ) |
| | ) |
| THE CRAIG ALLEN COMPANY L.L.C., | ) |
| CRAIG ALLEN TATRO, an individual, and | ) |
| ERIK DAVID LESCHUK, an individual, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' TRIAL BRIEF

NOW COME Defendants The Craig Allen Company L.L.C., Craig Allen Tatro, an individual, and Erik David Leschuk, an individual (hereinafter "defendants"), and submit the following brief to aid the court in considering the issues to be presented at trial.

### FACTS

**1. The John Allan Company**

John Allan Meing has been called an innovator in the field of men's grooming.  In 1988, he opened his first upscale men's grooming salon, John Allan's Men's Club, in downtown Manhattan.  Meing's general business philosophy was to provide specialized salon services and other amenities for men in the atmosphere of an old world men's club.  While Meing was the first to develop this philosophy and concept, the men's grooming industry has increasingly expanded during the last eighteen years, and many aspects of John Allan's philosophy have been emulated in other men's grooming salons throughout the United States.

In 2001, thirteen years after opening the downtown John Allan's Men's Club, Meing created The John Allan Company, LLC, (the "LLC") for the purpose of owning and operating a second location in midtown Manhattan.  Meing transferred all of his intellectual property rights to the LLC, and in return, the LLC gave him a license to use those rights in the downtown John Allan's, which he continued to personally own.   In April 2005, plaintiff, The John Allan Company, was formed, and the LLC transferred all of its assets and intellectual property rights to the new company.[1]  Over the course of the last year, plaintiff has opened two more clubs in New York:  one on the seventh floor of the Saks Fifth Avenue flagship store in midtown Manhattan and one in the Tribeca neighborhood in lower Manhattan.  Plaintiff attempts to distinguish its four clubs from others in New York by providing quality products and salon services with a high degree of customer care and immersed in the personality of Meing himself.

**a.   Plaintiff's Lack of Trade Dress Rights Prior to Its Discovery of Craig Allen's**

Never before initiating this litigation did Meing or plaintiff assert, or even act like they believed, that the design and décor of the John Allan's Clubs created a distinctive, protectable trade dress.  When Meing transferred his intellectual property rights to the LLC and licensed them back, both of the agreements executed in 2001—the Asset Purchase Agreement and the Trademark License Agreement—were utterly silent about trade dress rights.  Indeed, the only intellectual property assets that Meing and the LLC agreed had been used by Meing in the operation of the business and thus were the subject of the transaction were described as follows:

---

[1] Plaintiff's intellectual property rights include the following federally registered trademarks:  (1) Federal Registration Nos. 1953346 and 2988501 for the composite JA circle design/John Allan's mark used in association with men's and women's salon services and hair care products, respectively; (2) Federal Registration No. 2912311 for the mark, "MEN'S SERVICE REDISCOVERED" used in association with beauty salon and health spa services; and (3) Federal Registration No. 2853312 for the mark, "A RETURN TO A SIMPLER TIME" used in association with beauty salon and spa services.

<u>SCHEDULE A</u>

JOHN ALLAN'S U.S. Registration No. 1953346 (registered on January 30, 1996)

Common law trademarks JOHN ALLAN and JOHN ALLAN'S for haircare products.

Further, plaintiff never attempted to assert these rights over any other men's grooming salon, especially Troy Mitchell's.  The Troy Mitchell's salon, located in Tulsa, Oklahoma, was modeled almost exclusively after John Allan's midtown club.  Troy Lynn Mitchell, the salon's founder, contacted Meing and his business partner, Richard Macary, before opening Troy Mitchell's and told them that he was attempting to create a men's grooming salon in Tulsa, Oklahoma, in the same style as John Allan's.  Mitchell told Meing and Macary his design ideas and showed them his logo for the salon and its website.  Specifically, Mitchell told Meing and Macary that Troy Mitchell's would feature:  double-sided center cutting stations; leather club chairs for haircuts; simultaneous haircuts and manicures; wheeled stools for the stylists and manicurists; hot towel treatments in barber chairs; a pool table; a cigar room; a shoeshine stand; and complimentary beer for patrons.

John Allan's neither objected nor demanded a license fee in return; indeed, Meing openly shared with Mitchell ideas for the design and operation of the salon, including the general specifications for the leather club chairs for haircuts—a dominant feature of plaintiff's claimed trade dress—and ideas about the number of pool tables and televisions.  The only fee that Mitchell paid John Allan's was for a week-long training session for his stylists at the midtown club, during which they were taught how to cut hair while seated and while the customer sat in a leather club chair.  Indeed, during the training, one Troy Mitchell's employee was trained on how to handle traffic flow, in order to coordinate the delivery of services, including the hot towel treatment and simultaneous delivery of the haircut and manicure.

John Allan's was hoping for Mitchell to carry its product line in the salon; however, neither Meing nor plaintiff ever conditioned the help they gave Mitchell on any future actions of Mitchell.  Mitchell's relationship with John Allan's deteriorated when Mitchell refused to carry the product line exclusively in the Troy Mitchell's salon.  Soon thereafter, in June 2003, one of plaintiff's lawyers sent Mitchell a letter claiming that the information on Troy Mitchell's web site infringed plaintiff's trademarks and copyrights.  Plaintiff did not claim, however, that the design and décor of the Troy Mitchell's salon infringed plaintiff's purported trade dress rights.  Rather, the first time plaintiff made this claim was two years later, after it discovered the existence of Craig Allen's, and after Mitchell had sold the business to another person.

Finally, plaintiff's own marketing materials and business plan prove that it did not claim trade dress rights until this litigation.  Plaintiff itself has stated that the look and feel of each John Allan's club varies depending on the locale in which it operates.  The John Allan Company business plan specifically provides that, "the look, feel, and finishings of the Club will be determined by the selected location and the building's architecture period and use."  Further, plaintiff's website shows that it purposely created and still recognizes the inconsistencies in the décor of its clubs.  The website shows that the midtown club has a different look and feel than the downtown John Allan's, stating "[t]he midtown club takes the ambiance and feel of the downtown club and *recreates it, although with a modern design and larger space*," and "[o]pened in 2001, John Allan's midtown club takes the same ambiance and service of his downtown club and *recreates it for a modern, industrial setting*."  (emphasis added).

### b.  Plaintiff's Alleged Trade Dress

Even once plaintiff decided to assert trade dress rights against Craig Allen's, it could not articulate a consistent list of elements that constituted its trade dress.  Plaintiff has produced no

less than eight different lists of trade dress elements during this litigation.   Plaintiff finally

produced the following list in its trial brief, one week prior to trial:

- Frosted glass exterior windows etched with the John Allan's name and logo
- Frosted glass windows etched with phrases
- A pool table
- A bar and lounge
- Low club styled leather chairs in which clients sit during hair cuts
- Wheeled stools for stylists and manicurists to sit in when performing services
- Overhead electrical plugs for hair stylists to plug in blow dryers
- Double sided center cutting stations
- Miniature wooden dressers at cutting stations
- Low tables for positioning drinks near haircutting stations
- Manicure services provided simultaneously with haircuts
- Vintage barber chairs in which clients sit during hot towel treatments
- Black jackets with the John Allan's circular logo on the upper left chest area for clients to wear
- Valet and shoeshine men who wear black aprons with the John Allan's circular logo in the center
- Shoeshine stands
- A cigar room
- Oriental style rugs

Plaintiff's trade dress has been a veritable moving target throughout this litigation.

Plaintiff's counsel has repeatedly added and removed elements from the list, without ever really

knowing what constituted plaintiff's trade dress.  For example, in response to Defendants' First

Set of Interrogatories, plaintiff provided one list of elements, but then eight days later amended

this list immediately before the Rule 30(b)(6) depositions.  When Meing, plaintiff's designated

Rule 30(b)(6) witness, could not even provide a complete list of trade dress elements, plaintiff

amended its list again.  Plaintiff's numerous lists and the elements that comprise these lists are

attached hereto as Exhibit A.

Furthermore, plaintiff's clubs apparently conform to its business plan, as each club

creates a different overall impression.  The John Allan's downtown club recreates the feel of an

old world style men's club with its wood floor, wood paneling, and velvet curtains.  The

midtown club, however, creates a modern, industrial atmosphere with its cement floors, stark white walls, and unfinished ceiling.  The John Allan's at Saks Fifth Avenue and Tribeca differ from both the downtown and midtown clubs with their modern, trendy décor as shown by the stainless steel fixtures, aquariums, and tiled wall behind the bar.  Furthermore, not every trade dress element is used in every John Allan's club, and those elements of the trade dress that are used look different in each club.  Exhibit B sets forth plaintiff's current list of trade dress elements and how that element is used, if at all, in the John Allan's clubs.

### 2.  The Development of Craig Allen's

In 2003, entrepreneurs Craig Allen Tatro ("Tatro") and Erik David Leschuk ("Leschuk") learned of an emerging concept in the beauty industry:  the men's grooming salon.  Tatro and Leschuk performed some initial research on the concept, and after visiting the Troy Mitchell's salon, decided to open their own men's grooming salon in Wichita, Kansas.

Tatro and Leschuk had no experience in the men's grooming industry, so they performed extensive market research before opening their salon.  They read articles and researched on the Internet various men's grooming salons throughout the United States.  Tatro and Leschuk visited ten of the salons they found on the Internet, including the two John Allan's clubs that were in operation at the time.  At many of these salons, Tatro and Leschuk made notes, spoke with employees, and received salon services to learn about the operations and services available in a men's grooming salon.  Tatro and Leschuk worked on several occasions with Mitchell who allowed them to take extensive pictures of the Troy Mitchell's salon and provided them with other information for developing and designing Craig Allen's, including the Troy Mitchell's marketing materials.

Although Tatro and Leschuk copied certain aspects of almost every salon they visited, these aspects were not part of the salons' décor, but rather, part of the salons' business plan and operations.  For example, Tatro and Leschuk decided to use a shoeshine stand, to offer manicure services simultaneously with haircuts, and to offer hot facial towel treatments—all elements found in both John Allan's and Troy Mitchell's—but none of these features are the actual décor of either John Allan's or Troy Mitchell's.  These are elements of a business model or a type of doing business rather than the interior layout and design of a salon.[2]

Furthermore, Tatro and Leschuk wanted Craig Allen's to have a look and feel that would appeal to men in Wichita.  They believed that the interior design of Troy Mitchell's and John Allan's would not appeal to the men of Wichita.  Instead, defendants hired their own architect, who helped them create a salon that conveys the feeling of a plush, Midwestern-style country club through the dark leather chairs; cement flooring with inlaid wood; textured, olive green wallpaper; individual cloud ceilings with modern light fixtures; and dark stained wood throughout the salon.

### a.   The Design and Layout of Craig Allen's

Tatro and Leschuk opened the Craig Allen's salon on December 27, 2004.  The decor of the salon is noticeably different from John Allan's just by walking through its revolving glass front door.  The reception area of the salon feels like the reception area of a men's clothing store, as a dominant feature of the reception area is the interior connecting door to a prominent men's clothing store—Gentry Ltd.  Further, the reception area is partitioned off from the rest of the salon and contains dark stained wood shelving displaying products; four deep-seated leather

---

[2] This is the equivalent of copying an unpatented product, but not the shape of or packaging for the product.

chairs surrounding a coffee table; three traditional, elevated shoe shine stands; and a dark-stained wood front desk.

In the salon area, double-sided haircutting stations allow patrons and stylists to converse while receiving services.  Patrons sit in dark leather chairs that allow them to plant their legs firmly on the floor.  Electrical outlets in the floor provide electricity for the stylist's tools while the stylist sits in a wheeled stool to cut the patron's hair.  Retro-style barber chairs are also available for patrons to relax in while receiving hot towel treatments.  Two separate rooms are available in the rear of the salon for patrons to receive massages and skin treatments.

The pool table and cigar room take up another section of the salon, with the cigar room being a separate room with special ventilation to remove smoke.  The cigar room especially creates a masculine feel, with its dark wood walls, dark leather chairs, and dark red curtains.  At the rear of the salon, away from patron's sight, a counter holds two taps for serving beer to patrons, a sink, and a small refrigerator in which to store soda, water, and other drinks.  Patrons can also use the dry sauna and locker room after receiving services.

Craig Allen's salon services and operations are similar to those of John Allan's.  However, these operations have nothing to do with the interior design and décor of Craig Allen's.  Patrons have the option, for a certain fee, of becoming members of the salon, which entitles them to unlimited haircuts and other salon services for a year.  Salon services generally consist of a massaging shampoo, a hot facial towel treatment, and a simultaneous haircut and manicure.  Patrons are offered a drink after receiving salon services, which they may enjoy while playing pool or relaxing in the cigar room, where they can also purchase and smoke cigars.

Besides developing the design and operations of the salon, Tatro and Leschuk created the salon's name, logo, and promotional material.  When choosing a name, Tatro and Leschuk were

looking for a name that created a masculine impression and rolled well off the tongue.  They did not want to use Leschuk's first name, "Erik," because a well-known salon in Wichita, "Eric Fisher's" already contained that name.  Ultimately, Tatro and Leschuk chose the name "Craig Allen's" after Tatro confessed that he had always wanted to name a business after his legal first and middle names, "Craig" and "Allen."  Soon thereafter, Tatro and Leschuk formed The Craig Allen Company, LLC, for the purpose of owning and operating the salon.

### b.  The Design of Craig Allen's Name and Logos

In addition, Tatro and Leschuk developed logos for the salon for use on its letterhead, promotional material, advertisements, and apparel.  The logos, reproduced below, consisted of the initials "CA" enclosed in a circle (the "CA circle design") and the composite logo consisting of the CA circle design with the words "Craig Allen's" written below (the "composite CA circle design/Craig Allen's logo").

     

Tatro created the CA circle design after seeing the JA circle design in a third party publication featuring an article on the John Allan's clubs.  Tatro innocently thought that he could use the logo as a model for his own initials, "CA," because it was not accompanied by a trademark symbol and because the Craig Allen's salon would be located across the country from John Allan's.  Furthermore, Tatro felt that the CA circle design fit well with another logo he previously created for one of his businesses that also consisted of his initials, "CAT," in the form of a circle.

Defendants used both the CA circle design and the composite CA circle design/Craig Allen's logo on advertisements, promotions, signs, frosted glass partitions and exterior windows of the salon, and on all clothing apparel, such as hats, t-shirts, sweatshirts, the stylist's t-shirts, shoe shine aprons, and black cutting jackets.

### 3. Plaintiff's Discovery of Craig Allen's and Actions Thereafter

In February of 2005, plaintiff discovered the existence of Craig Allen's in Wichita, Kansas. After finding that Craig Allen's used the CA circle design, plaintiff sent a letter to defendants demanding that they cease all use of their alleged infringing marks and trade dress.

At the same time, plaintiff sent another demand letter to Troy Mitchell's salon, which had previously been sold by Mitchell to a new owner. Perhaps capitalizing on the new owner's inexperience and lack of knowledge, plaintiff claimed that the Troy Mitchell's logo and design infringed its trademarks and trade dress, even though plaintiff had approved of both only two years before. Plaintiff alleged that the Troy Mitchell's logo infringed its composite mark because it consisted of two initials enclosed in a circle and the actual name of a person in possessive form. Thus, not only was plaintiff attempting to assert fabricated trade dress rights over a salon whose design it had previously approved, but it was trying to stop Troy Mitchell's owner from using a personal name and initials in geometric form as a logo for the salon.

While it sent its initial demand letter to Craig Allen's in March of 2005, plaintiff did not file its lawsuit until two months later, because it was waiting to finalize the agreements purportedly creating its alleged trade dress rights in John Allan's. The original 2001 Asset Purchase Agreement and Trademark License Agreement did not transfer any existing trade dress rights either to the LLC or back to Meing, so plaintiff's then counsel created undated, retroactively effective agreements purporting to "clarify" the scope of intellectual property rights

that were the subject of the 2001 transaction.  Once these rights were "created," The John Allan

Company was formed, and the LLC transferred its assets, including the newly created trade dress

rights, to the new company.

Defendants have ceased all use of its allegedly infringing marks.  Indeed, Tatro and

Leschuk removed all forms of the CA circle design and the composite CA circle design/Craig

Allen's logo from the salon and its website.  Tatro and Leschuk have created a new logo,

reproduced below both alone and in composite form, consisting of the CA initials surrounded by

a laurel leaf.  Tatro and Leschuk spent a substantial amount of time and money creating and

branding the salon with its new logo, and have no intent of returning to the CA circle design.

Plaintiff has admitted that the new logo, the CA initials surrounded by the laurel wreath design,

is not confusingly similar to its JA circle design, also reproduced below both alone and in its

federally registered composite form.







Defendants have also ceased all use of the phrases "men's service rediscovered" and "a

return to a simpler time."  Tatro and Leschuk initially saw the phrases in marketing materials

provided by Troy Mitchell's and incorrectly believed that they could use them for Craig Allen's

marketing material.  Tatro used the phrase "men's service rediscovered" in a written interview

with the Wichita Business Journal that later published the phrase as Tatro's direct quote.  Craig

Allen's initially had a link to the article on their website, but immediately removed the link as plaintiff demanded.  The phrase also appeared in the text of an article that ran in a Gentry Ltd. publication.  When Craig Allen's used the phrase, it did not know it was a registered mark, as the mark was not accorded federal registration by the U.S. Patent and Trademark Office until seven months after Tatro used it.

Similarly, Craig Allen's only used the phrase "a return to a simpler time" once, on one of the front windows of the salon.  Craig Allen's removed the phrase from its window after discovering plaintiff's registration of the mark and prior to any mention of the issue by plaintiff or its counsel.  Indeed, the first time that plaintiff claimed defendants infringed the mark was in the pretrial order.  Thus, while Tatro and Leschuk were perhaps misguided in believing that their use of the phrases was permissible, their use was innocent.

## ARGUMENT AND AUTHORITIES

Plaintiff has filed this suit in an attempt to create monopoly rights in the business plan and philosophy of its clubs by claiming that defendants wrongfully copied and infringed their trademark and trade dress rights.  Plaintiff assumes that because Meing created the first men's grooming club, it has the ability to prevent others from opening similar salons throughout the United States.  Plaintiff fails to recognize that to prevent another's imitation of its business idea, that idea must be protected by some form of intellectual property.

The fundamental principle of the American economy is "that anyone's business ideas, inventions, writings, and symbols, once disclosed to the public, are in the public domain and may be freely copied."  1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 1:2 (4th ed. 2004) [hereinafter McCarthy]; *see also Int'l News Serv. v. Associated Press,* 248 U.S. 215, 250, 63 L. Ed. 211, 39 S. Ct. 68 (1918) ("The general rule of law is that the noblest of

human productions—knowledge, truths ascertained, conceptions and ideas-become, after voluntary communications to others, free as the air to common use.") (Brandeis, J., dissenting); *Winning Ways v. Holloway Sportswear*, 903 F. Supp. 1457, 1460 (D. Kan. 1995) ("The right to copy items within the public domain exists in the common law and is inherent in the free enterprise system."). The public domain consists of all ideas, works, or symbols not protected by intellectual property.  1 McCarthy, *supra*, § 1:2.  Thus, any work not protected by a form of intellectual property is subject to imitation.

A trademark is a "distinctive mark, symbol, or emblem used by a producer or manufacturer to identify and distinguish his goods from those of others.  A trademark identifies the source of goods and assures purchasers of a certain degree of uniformity and quality."  74 Am. Jur. 2d Trademarks § 1 (2006).  *See also* 15 U.S.C. § 1127.  A trademark is an objective symbol of the goodwill that a business has built up.  1 McCarthy, *supra*, § 3:2.  "Without the identification function performed by trademarks, buyers would have no way of returning to buy products that they have used and liked.  If this consumer satisfaction and preference is labeled 'good will,' then a trademark is the symbol by which the world can identify that good will."  *Id*.

One type of trademark is a trade dress, which is "the total image of a product and may include features such as size, shape, color or color combinations, texture and graphics."  74 Am. Jur. 2d Trademarks § 38 (2006).  Like a trademark, a trade dress must denote a particular product source to be entitled to protection.  1 McCarthy, *supra*, § 8:3.  In addition, the party asserting trade dress rights must define an exact list of elements that make up the trade dress.  *Id*.

The basic policy behind trademark law is to protect the public from being confused as to the source of origin of a product.  1 McCarthy, *supra*, § 2:1.  To accomplish this, the law allows the owner of a trademark to prevent others from using another mark that is "likely to cause

confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). The owner does not have to prove that another person actually copied his mark and used it on related goods. 3 McCarthy, *supra*, 23:121. Rather, the owner must show that the other's mark is confusingly similar to his mark. *Id*. § 23:3.

Even if an alleged infringer does copy another's mark, the act of copying alone is not inherently wrongful. Trademark law makes a distinction between merely copying another's mark and copying another's mark with the intent to deceive consumers. 3 McCarthy, *supra*, § 23:122. Copying another's mark with the intent to confuse consumers into thinking that one's product is affiliated or connected with another's is wrongful. *Id*. A person cannot copy another's trademark with the intent of confusing consumers that his product is actually that of the trademark owner's. Therefore, if a person uses a mark in an area where consumers have never heard of the other's trademark or product, there can be no intent to deceive.

Tatro's and Leschuk's alleged acts of copying plaintiff's business ideas were not wrongful. Tatro and Leschuk did not intend to deceive consumers when they opened Craig Allen's in Wichita, Kansas. Because of defendants' pre-litigation concession, some of plaintiff's claims are moot; the rest of plaintiff's claims lack merit.

### 1. The design and décor of Craig Allen's does not infringe plaintiff's alleged trade dress.

Plaintiff has asserted a frivolous trade dress claim based on the unfounded assertion that it has trade dress rights in the John Allan's clubs. To prevail on its claim, plaintiff must prove (1) that its alleged trade dress is inherently distinctive or distinctive by virtue of having acquired secondary meaning; (2) that there is a likelihood of confusion between plaintiff's alleged trade dress and the Craig Allen's salon; and (3) that its alleged trade dress is nonfunctional. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000); *Sally Beauty Co. v. Beautyco, Inc.*, 304

F.3d 964, 977 (10th Cir. 2002).  Plaintiff cannot establish any of the three elements of its claim, and therefore, is not entitled to permanent injunctive relief.

a.   **Plaintiff does not have a protectable trade dress.**

Plaintiff's claimed trade dress is not distinctive, either inherently or through the acquisition of secondary meaning.   *See Wal-Mart*, 529 U.S. at 209 (stating that plaintiff must prove that its trade dress is either inherently distinctive or distinctive through the acquisition of secondary meaning).  Perhaps the best evidence of plaintiff's lack of trade dress protection is its own actions.  Plaintiff did not conceive of, assert, or even act like it believed it had dress rights until it discovered the existence of Craig Allen's in February 2005, seventeen years after the first John Allan's club opened.   Indeed, plaintiff's conduct prior to initiating this lawsuit is undeniably inconsistent with its current assertion of trade dress rights, as:

- Plaintiff cannot articulate a consistent list of elements that constitute its trade dress.

- None of the agreements between the LLC and Meing mentioned trade dress rights.  Meing transferred to and licensed back from the LCC only rights in the trade name "John Allan's" and the composite JA circle design/John Allan's mark.  After deciding to file this lawsuit, plaintiff's lawyer created undated, retroactively effective documents purporting to transfer substantially greater intellectual property assets, including plaintiff's purported trade dress, between Meing and the LLC.

- Plaintiff openly encouraged Mitchell to copy almost all aspects of John Allan's when opening Troy Mitchell's and only enforced its purported trade dress rights against Troy Mitchell's after it decided to file this action.

- Plaintiff's own business plan states that the design of each club would vary based on the locale in which it operates.

Moreover, even if the court does find that plaintiff had previously conceived of trade dress protection prior to discovering Craig Allen's, plaintiff cannot prove that its trade dress is inherently distinctive.  A trade dress is "inherently distinctive if it serves to identify a particular source."  *Wal-Mart Stores, Inc.*, 529 U.S. at 209; *see Vornado Air Circulation Sys. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995) (stating that a product's trade dress features are inherently distinctive "because their intrinsic nature is such as to almost automatically tell a customer that they refer to a brand") (citations omitted).   A trade dress's distinctiveness is usually determined based on an increasing scale where the trade dress is classified as: (1) generic, (2) descriptive, (3) suggestive, or (4) fanciful or arbitrary.  *Buca, Inc. v. Gambucci's, Inc.*, 18 F. Supp. 2d 1193, 1202 (D. Kan. 1998); *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1463 (D. Kan. 1996).   Under this approach, a trade dress classified as generic or descriptive is not inherently distinctive and is only entitled to protection if it has acquired secondary meaning.  *Buca*, 18 F. Supp. 2d at 1202-03.

Plaintiff's purported trade dress cannot be inherently distinctive because the design of the four John Allan's clubs does not create a consistent, commercial impression identifying a single source.  Plaintiff states in its trial brief that it is not claiming trade dress protection for its Saks and Tribeca locations, but this concession does not lessen the importance of the fact that the design and décor of those locations is very different.   All four of plaintiff's clubs operate prominently under the John Allan's name and logo.  The fact that all four create different overall impressions completely undercuts plaintiff's trade dress claim.

In *Goddard, Inc. v. Henry's Foods, Inc.*, a federal district court held that the plaintiff's "failure to consistently employ its own trade dress *fatally undermines*" any finding that its trade dress is distinctive.  291 F. Supp. 2d 1021, 1049 (D. Minn. 2003) (emphasis added).   The

plaintiff in that case admittedly allowed its store owners to exclude certain elements of its trade dress or use different sizes, shapes, and colors for some of the elements in their stores. *Id*. at 1045. The court found that this variation among the plaintiff's stores did not create a distinctive trade dress, but a "fluid marketing concept distinctive only in its variety." *Id*. Further, the court stated that if the varying designs of the plaintiff's stores did create a distinctive trade dress, then the plaintiff would be able to "monopolize the market simply [by] combining different color combinations, and other physical features, to deprive its competitors of any opportunity to market similar products." *Id*.

Similarly, granting plaintiff trade dress protection in this case would effectively allow it to monopolize the men's grooming industry. Plaintiff is attempting to claim trade dress protection in the varying designs of its four clubs, but has admitted that it does not use the elements of its trade dress consistently throughout its clubs, especially the John Allan's at Saks and Tribeca. Further, the John Allan's at Saks and Tribeca incorporate additional, prominent features in their interior design, eroding any distinctiveness that plaintiff may claim.

In addition, the elements of plaintiff's trade dress look different in each club. For example, all four of the John Allan's clubs use a different style of "low cut leather chair for patrons to sit in while getting their hair cut." The chairs at the downtown club are green, tufted leather, boardroom style with high wooden legs and arms; the chairs at the midtown club are deep-seated tan leather with short legs; the chairs at the Saks Fifth Avenue club are white leather with grey leather trim and short wooden legs; and the chairs at the Tribeca club are white leather with grey leather trim and short wooden legs. The only element used somewhat consistently throughout the four clubs—one that is not present in Craig Allen's—is the overhead electrical plugs for stylists to use.

Plaintiff's alleged trade dress also has not acquired secondary meaning.  A trade dress acquires secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself."  *Buca, Inc. v. Gambucci's, Inc*, 18 F. Supp. 2d 1193, 1203 (D. Kan. 1998).  A plaintiff must prove that "the consumers associate the trade dress with a single source, even if the name of that source is unknown."  *Id*. at 1204.

The courts consider a variety of factors to determine when a trade dress has acquired secondary meaning, including:  (1) consumer testimony or surveys linking the trade dress to a single source, (2) advertising, (3) unsolicited media coverage of the product, (4) exclusivity and length of use, (5) sales success, and (6) intentional copying of trade dress.  No one factor is dispositive, and evidence does not have to be presented on every factor.  *Buca*, 18 F. Supp. 2d at 1204.  Plaintiff must, however, show secondary meaning in the targeted market.  *Id*. (citing *T.G.I. Friday's, Inc. v. International Restaurant Group*, Inc., 405 F. Supp. 698, 709 (M.D. La 1975) ("The Court concludes that plaintiff has failed to prove that the consuming public *in this area* associates its "trade dress" exclusively with its restaurants and no one else's . . . ." (emphasis added)).  Thus, in this case, plaintiff must establish that consumers in Wichita, Kansas, would recognize its purported trade dress and affiliate it with the John Allan's clubs.

i.  Plaintiff has presented no evidence of consumer surveys.

Consumer surveys are generally the most persuasive evidence of secondary meaning. *Buca*, 18 F. Supp. 2d at 1204.  Plaintiff has not conducted any surveys to determine whether consumers in Wichita, Kansas, recognize and associate its purported trade dress with the John Allan's clubs.  Indeed, plaintiff has presented no evidence that its trade dress is recognized

anywhere other than in New York or among its members.   Thus, this factor weighs against plaintiff in finding that its alleged trade dress has acquired secondary meaning.

> ii.   <u>Plaintiff's advertisements do not create an association with the design of John Allan's in the mind of consumers.</u>

A court may look to the amount, scope, nature, and duration of advertising when determining whether or not a trade dress has acquired secondary meaning.  *Id*.  The primary question, however, "'is not the extent of the promotional efforts but their effectiveness in creating an association' in the mind of the consumer between the trade dress and the plaintiff." Further, the advertising and promotional activities must feature the trade dress itself.  *Id*.

This factor weighs against a finding of secondary meaning.   Plaintiff claims that its advertising expenditures and promotional material show that its purported trade dress has acquired secondary meaning, but little of plaintiff's advertisements actually describe its trade dress elements.   Plaintiff's print advertisements primarily promote John Allan's products and grooming services, not the amenities found in its clubs.   Further, when plaintiff conducted product launches at retail stores outside of New York—none of which have been in Kansas—it did not even use the all of the elements of its trade dress at those launches.   The only element that plaintiff brought to those launches was the low cut leather chairs.   Thus, plaintiff's promotional expenditures and materials do not result in consumers in Wichita, Kansas, affiliating its alleged trade dress with John Allan's.

   iii. <u>Unsolicited Media Coverage of John Allan's does not establish secondary meaning.</u>

Plaintiff claims that it has received unsolicited media coverage touting its purported trade dress. However, the publications plaintiff references as evidence of its notoriety do not actually describe the elements of plaintiff's claimed trade dress. Like plaintiff's promotional material, most of these publications refer generally to plaintiff's salon services or products. Therefore, this factor weighs against a finding of secondary meaning.

   iv. <u>Plaintiff has not exclusively used its trade dress throughout its four clubs.</u>

Plaintiff has not consistently and exclusively used its trade dress and therefore cannot show that it has acquired secondary meaning. At least two federal courts have held that a plaintiff does not show consistent and exclusive use of its trade dress when there are variations among plaintiff's stores themselves. *Rally's, Inc. v. Int'l Shortstop, Inc.*, 776 F. Supp. 451, 456 (E.D. Ark. 1990); *Goddard, Inc. v. Henry's Foods, Inc*., 291 F. Supp. 2d 1021, 1045 (D. Minn. 2003). As previously discussed, none of the John Allan's clubs contain all the elements of plaintiff's trade dress, and the elements they do contain vary among the clubs. Further, the John Allan's at Saks and Tribeca contain additional features that serve only to confuse consumers as to the clubs' identity. Thus, plaintiff has failed to consistently employ the elements of its trade dress throughout its clubs, and cannot use this factor to show that its alleged trade dress has acquired secondary meaning.

   v. <u>The amount of plaintiff's sales is not a significant factor in determining whether plaintiff's trade dress has acquired secondary meaning.</u>

Sales figures are subject to numerous interpretations and standing alone cannot establish secondary meaning. *Buca*, 18 F. Supp. 2d at 1206. Because it does not operate a club or

distribute products in Wichita, evidence of John Allan's sales carries little weight in establishing secondary meaning.

vi.   <u>Tatro's and Leschuk's alleged copying was not inherently wrong.</u>

While proof of intentional copying may be sufficient to establish secondary meaning, defendants did not intentionally copy plaintiff's alleged trade dress.  Tatro and Leschuk relied primarily on the features and operations of Troy Mitchell's when designing Craig Allen's.  They did not use John Allan's business plan as a model for developing their salon.  Further, there was nothing inherently wrong with Tatro and Leschuk's alleged acts of copying Troy Mitchell's. Business ideas, once disclosed to the public, may be freely copied.  1 McCarthy, *supra*, 1:2. Here, defendants simply copied Troy Mitchell's business plan—the idea of offering specialized salon services and amenities to men in an upscale environment.  Tatro and Leschuk hired their own architect to help them create a distinct look and feel for Craig Allen's that would appeal to men in Wichita, Kansas.

**b.  The design of Craig Allen's is not confusingly similar to the design of any of the four John Allan's clubs.**

To prevail on its trade dress claim, plaintiff must prove that potential customers in Wichita, Kansas, are likely to be confused by Craig Allen's trade dress into thinking that Craig Allen's is affiliated, connected, or associated with John Allan's.  *See Buca*, 18 F. Supp. 2d at 1208 ("The plaintiff in a trade dress action must show that 'potential customers are likely to be confused by the defendant's trade dress into thinking that the defendant is affiliated, connected, or associated with the plaintiff . . . .'" (citations omitted)).  To do so, plaintiff must demonstrate that the décor of Craig Allen's "creates a likelihood of confusion on the part of an appreciable number of ordinary purchasers exercising due care in the circumstances."  *Id.* at 1209.  A plaintiff generally proves a likelihood of confusion in three ways:  "(1) survey evidence; (2)

21

evidence of actual confusion; and/or (3) argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace." 3 McCarthy, *supra*, § 23:63.

Neither of the first two types of evidence is present here.  Plaintiff did not conduct any surveys to determine the extent to which ordinary consumers recognize either the name "John Allan's" or its claimed trade dress.  Further, the witness testimony plaintiff plans to offer as evidence of actual confusion is nothing more than anecdotal comparisons of the amenities and designs of the John Allan's clubs and Craig Allen's.  None of plaintiff's witnesses were actually confused into thinking that Craig Allen's was associated or affiliated with John Allan's.

Thus, the Court must not only compare pictures of the interior design of Craig Allen's to the four John Allan's clubs, but also determine whether ordinary consumers who may enter Craig Allen's in Wichita, Kansas, are likely to be confused into thinking they are in a John Allan's club.   The court considers the following factors when determining likelihood of confusion between two trademarks or trade dresses:

> (1) the degree of similarity between the marks, including the marks' appearance, pronunciation, suggestion, and manner of display;
> (2) strength or weakness of the plaintiff's mark;
> (3) the intent of the alleged infringer in adopting its mark;
> (4) similarities and differences of the parties' goods, services and marketing strategies;
> (5) the degree of care likely to be exercised by purchasers of the goods or services involved; and
> (6) evidence of actual confusion, if any.

*Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998).  Some factors may be more relevant than others depending on the case.  *Id*.  Likelihood of confusion is based on all of the relevant factors, with no one factor being dispositive.  *Id*.  The key question is whether the

consumer "is likely to be deceived or confused by the similarity of the marks." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992).

In this case, the Court need not apply the six factor test to determine that there is no likelihood of confusion because any potential for confusion may be dispelled at the point of sale. Likelihood of confusion at the point of sale consists of "a purchaser's confusion as to a product's origin or sponsorship occurring at the time of purchase." *General Motors Corp. v. Keystone Auto. Indus.*, No. 05-1712, 2006 U.S. App. LEXIS 16480, at *7-8 (6th Cir. June 30, 2006) (citing 3 McCarthy, *supra*, § 23:5). The courts have held that "there can be no likelihood of confusion at the point of sale where a defendant conspicuously and unequivocally informs buyers that the defendant, and not the plaintiff, is the source of the product. *Id*. at *8. *See also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107-08 (2d. Cir. 2000) (finding that there can be no likelihood of confusion if consumers know they are purchasing a knock-off from the original).

Here, any likelihood of confusion that could possibly exist between plaintiff's claimed trade dress and the Craig Allen's salon will only occur, if at all, at the point of sale. Potential customers must actually walk inside Craig Allen's before they may be confused that it is a John Allan's club. Even if these customers were initially confused, because of the personalized nature of the services offered, Craig Allen's employees can disavow any affiliation with John Allan's before a customer receives services. Thus, there can be no likelihood of confusion if customers know they are not inside a John Allan's club.

Furthermore, even if the court finds that confusion will not be dispelled at the point of sale, an analysis of the six factors shows that there is no likelihood of confusion between plaintiff's purported trade dress and the design of Craig Allen's salon.

i.   There are few similarities in the design and layout of Craig Allen's and the four John Allan's clubs.

When determining the similarity of two trade dresses, each trade dress must be considered as a whole. *Heartsprings,* 143 F.3d at 554.  Further, "even if the trade dresses are similar, the likelihood of confusion is reduced if the two trade dresses, taken as a whole, are visually distinct." *Id*.  Thus, defendants are allowed to use certain elements of plaintiff's trade dress, as long the overall look of Craig Allen's is visually distinct.

The overall look of Craig Allen's is visually distinct from the four John Allan's clubs.  Craig Allen's creates the feeling of a plush, Midwestern-style country club through its dark-stained wood fixtures, dark leather chairs, wood and cement floor, olive green, textured wallpaper, and cloud ceilings with modern light fixtures.  None of the John Allan's clubs create this impression.  The John Allan's downtown club creates the feeling of an old world men's club or pool hall with its wood floors, boardroom-style cutting chairs, and full service bar.  The midtown club creates more of an industrial atmosphere with its stark white walls, cement floors, and unfinished ceiling.  The Saks Fifth Avenue and Tribeca John Allan's have a modern, trendy feel with stainless steel fixtures, large aquarium, cement floor, and tiling behind the bar.

Moreover, Craig Allen's does not use all of the elements of plaintiff's alleged trade dress and contains additional features not found in the John Allan's clubs.  Craig Allen's does not have overhead electrical plugs for the stylists' equipment or a bar and lounge for patrons.  Craig Allen's "bar" is actually a counter in a hallway leading to the restrooms containing beer taps and a small refrigerator.  Additional elements in Craig Allen's include a reception area partitioned off from the rest of the salon, an interior door connecting the reception area to a men's clothing store, a revolving glass front door, and a locker room with a dry sauna.

Even if Craig Allen's does contain some of the elements of plaintiff's alleged trade dress, the elements in Craig Allen's are visually distinct from those in John Allan's.  The double-sided center cutting stations at Craig Allen's consist of custom-made wooden cabinets with a mirror placed on top of it.  Tatro and Leschuk ordered the cabinets with the intention that they look different from those at the John Allan's clubs.  Moreover, at both salons, the cutting stations actually serve the function of allowing salon patrons to converse with each other while receiving salon services.  At Craig Allen's, they serve the additional function of allowing more haircutting stations inside the salon.  In addition, the barber chairs at Craig Allen's are not the "antique style" that plaintiff claims as part of its trade dress, but a 1950's retro-style barber chair.  The black cutting jackets that Craig Allen's uses do not have logos embroidered on them, unlike the black cutting jackets claimed as part of plaintiff's trade dress.  Finally, patrons of Craig Allen's may actually purchase and smoke cigars in its cigar room while the patrons of John Allan's cannot.

ii.  <u>John Allan's alleged trade dress is weak.</u>

John Allan's alleged trade dress is weak because it is not inherently distinctive and has not acquired distinctiveness through secondary meaning.  Accordingly, this factor weighs against a finding of likelihood of confusion.

iii.  <u>Tatro and Leschuk did not intend to derive any benefit from John Allan's trade dress when they designed Craig Allen's.</u>

If the alleged infringer did not intend to derive benefit from the plaintiff's trade dress, then this factor weighs against a finding of likelihood of confusion.  *Buca, Inc. v. Gambucci's, Inc.*, 18 F. Supp. 2d 1193, 1209 (D. Kan. 1998).  Tatro and Leschuk had no intention of trading off the goodwill or reputation of John Allan's when they designed Craig Allen's.  They always intended for Craig Allen's to have its own, unique décor and design.  While defendants did copy

the idea of frosted glass and a steel pedicure bucket from John Allan's, this is not evidence of taking the goodwill or benefit associated with John Allan's alleged trade dress.

> iv. There are few similarities in the marketing strategies of Craig Allen's and John Allan's.

Both John Allan's and Craig Allen's offer salon services exclusively to men in an upscale environment, but these similarities alone do not support a finding of likelihood of confusion because Craig Allen's and John Allan's operate in two separate markets. In *Buca, Inc. v. Gambucci's, Inc.*, the court found that the likelihood of confusion was slight even though the plaintiff and defendants sold similar goods because they operated their restaurants in two separate markets. 18 F. Supp. 2d at 1210. Likewise, John Allan's operates in completely separate market from Craig Allen's. Plaintiff does not operate a club or sell its products anywhere in Kansas, let alone in Wichita.

Further, even though plaintiff claims it has "plans" to expand the John Allan's clubs across the United States, this evidence is of minimal value in determining likelihood of confusion. *See Universal Money Ctrs. v. AT&T*, 797 F. Supp. 891, 895 (D. Kan. 1992) ("[T]he intent of the prior user to expand or its activities in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion."). Considering plaintiff has scant evidence that anyone in Wichita, Kansas, has even heard of the John Allan's clubs, potential customers of John Allan's located in Wichita almost certainly do not know of any plans for expansion. Therefore, plaintiff's plans for expansion do not support a finding of likelihood of confusion between its claimed trade dress and Craig Allen's.

v. <u>Customers of John Allan's and Craig Allen's exercise a high degree of care when choosing a salon.</u>

When looking at the degree of care exercised by consumers, the court should consider the "general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers give in buying that class of goods." *Buca*, 18 F. Supp. 2d at 1210.  In this case, the degree of care exercised by Craig Allen's patrons is high.  Craig Allen's caters to business men and other professionals looking for a certain level of service or ambiance when visiting a salon.  The services offered are not the traditional haircut that one receives at a barbershop.  Further, many of Craig Allen's customers are members who pay an annual fee.  These men are repeat customers of the salon who are not going to be confused as to its identity.     Thus, this factor weighs against a finding of likelihood of confusion.

vi. <u>Plaintiff has no evidence of actual confusion between the alleged trade dress of John Allan's and the design and layout of Craig Allen's.</u>

Plaintiff has no evidence of actual confusion between plaintiff's alleged trade dress and the design of Craig Allen's.  Indeed, not one person has entered Craig Allen's and thought that they were in a John Allan's club.  Plaintiff may offer the testimony of Chad Green and Chip Chimera as supposed evidence of actual confusion between John Allan's alleged trade dress and Craig Allen's, but these witnesses were never actually confused as to the identity of Craig Allen's.   Actual confusion occurs when "consumers make an incorrect mental association between the involved commercial products or their producers." *Jordache Enters., Inc. v. Duran*, 828 F.2d 1482, 1484 (10th Cir. 1987); *see also Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1265 n.7 (9th Cir. 2001) ("[I]f two products look somewhat the same, but consumers suffer no confusion, there can be no successful trademark infringement claim").  Both Green and

Chimera knew they were not in a John Allan's club when they visited Craig Allen's.  While they both may have believed the salons looked similar because they have some of the same amenities, such as a pool table or shoeshine stand, they were not actually confused as to the identity of Craig Allen's.

Based on the six factors set forth above, plaintiff cannot prove that there is a likelihood of confusion between the design of Craig Allen's and its claimed trade dress.

### c.   Plaintiff cannot prove that its trade dress is nonfunctional.

Plaintiff has the burden to prove that its purported trade dress is nonfunctional.  *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001).  To prove nonfunctionality, plaintiff must establish that its trade dress, as a whole, would leave a multitude of alternatives to the industry that would not prove confusingly similar to its trade dress.  *Clicks Billiards, Inc. v. Forbes*, 251 F.3d 1252, 1261 (9th Cir. 2001).

In *Clicks*, the Ninth Circuit looked to the aesthetic nature of the plaintiff's trade dress when determining that the plaintiff raised an issue of fact regarding the nonfunctionality of the design of its pool hall.  *Id*.  The court noted that the plaintiff had made distinct aesthetic decisions with respect to the colors, patterns, darkness of the wood, and placement of various items within the pool hall.  *Id*. at 1261-62.  The court found that the fact "that these decisions were made for aesthetic reasons—and not, for example, because they were the only, the cheapest, or the most efficient way to design the pool hall—was evidence of nonfunctionality" of its trade dress.  *Id*. at 1262.

Plaintiff cannot prove that its purported trade dress is nonfunctional because it cannot establish its trade dress leaves a multitude of alternatives for others to open men's grooming salons.  Unlike the plaintiff in *Clicks*, plaintiff has not made specific, aesthetic decisions as to the

layout, color combinations, or placement of certain items in its club.  Indeed, the inconsistency in design of the John Allan's clubs shows that it has ignored these decisions.  Plaintiff's claimed trade dress consists of the general amenities found in some of its clubs, such as a shoeshine stand, a pool table, or leather chairs.  If plaintiff receives trade dress protection just because it incorporates such general objects in a men's salon, it will be able to effectively prevent others from opening men's grooming salons across the country.  Any grooming salon that simply contains its trade dress elements, no matter where they are placed or what they look like, will be confusingly similar to plaintiff's alleged trade dress.

Moreover, as a whole, plaintiff's purported trade dress serves the function of creating a men's club.  Plaintiff advertises its product as "clubs" that cater exclusively to men.  Its trade dress functions to create the "club" atmosphere by incorporating amenities that generally appeal to men, such as the cigar room, pool table, and shoeshine stand.  Because it effectively creates a men's club, plaintiff cannot prove that its purported trade dress is nonfunctional.

Overall, plaintiff cannot establish that its trade dress is distinctive, either inherently or through the acquisition of secondary meaning, that there is a likelihood of confusion between the design of Craig Allen's and its purported trade dress, and that its trade dress is nonfunctional.  Accordingly, plaintiff's trade dress claim fails, and the Court should deny plaintiff's request for a permanent injunction.

**2. Neither the name "Craig Allen's" nor defendants' new composite mark is confusingly similar to the name "John Allan's."**

The name "Craig Allen's," whether used alone or in conjunction with any graphic element, does not infringe plaintiff's trade name of "John Allan's."  To establish that defendants are liable for infringing the trade name "John Allan's," plaintiff must establish (1) that it has protectable rights in the name "John Allan's" and (2) that there is a likelihood of confusion

between the trade name "Craig Allen's" and the trade name "John Allan's." *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 582 (2d Cir. 1993).

Similar to trade dress law, likelihood of confusion between two trademarks is determined by looking at a variety of factors, including:

> (1) the degree of similarity between the marks, including the marks' appearance, pronunciation, suggestion, and manner of display;
> (2) strength or weakness of the plaintiff's mark;
> (3) the intent of the alleged infringer in adopting its mark;
> (4) similarities and differences of the parties' goods, services and marketing strategies;
> (5) the degree of care likely to be exercised by purchasers of the goods or services involved; and
> (6) evidence of actual confusion, if any.

*Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998).

> **a.  The name "Craig Allen's" is not confusingly similar to the name "John Allan's"**

Plaintiff's claim that the name "Craig Allen's" infringes its trade name, "John Allan's," is meritless.[3]   Plaintiff did not conduct any surveys to determine the extent to which consumers in Wichita recognized the name "John Allan's."   Further, plaintiff has no evidence of actual confusion between the two names; plaintiff's witness testimony merely consists of comparisons of the two names, which is not actual confusion.   Thus, the Court must analyze the two names based on the six factor test to determine whether a potential customer in Wichita, Kansas, would see the name "Craig Allen's" and be confused into thinking it referred to the John Allan's clubs.

None of the six factors set forth above point to a likelihood of confusion between the two names.

---

[3] Defendants assume that plaintiff has a protectable trademark in the name "John Allan's" even though plaintiff repeatedly uses the name to refer to John Allan Meing rather than as a source of origin for either its salon services or products.

       i.  <u>The names "Craig Allen's" and "John Allan's" are not similar in appearance, pronunciation, or meaning.</u>

The degree of similarity between marks is determined by looking at three factors:  sight, sound, and meaning.  *Medi-Flex, Inc. v. Nice-Pak Products, Inc.*, No. 06-2015-KHV, 2006 U.S. Dist. LEXIS 17883, at *18 (D. Kan. April 7, 2006) (citing *King of Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999).  Each factor is not considered in isolation, but in the context of the marks as a whole.  *Id*.  Thus, the Court must determine whether consumers would be confused when presented with the name "Craig Allen's" alone rather than when presented with the two names side-by-side.

When viewed as a whole, the names "Craig Allen's" and "John Allan's" do not look like, sound similar to, or even have the same meaning.  The name "Craig" does not look like or sound similar to the name "John."  Even when used in conjunction with the name "Allen," the names suggest an entirely different person.

Moreover, even the U.S. Patent and Trademark Office (the "PTO") recognizes that two marks, both containing the second word "Allen," are distinguishable.  Indeed, the PTO has granted registration to at least twelve marks, all used in association with the same or similar goods and containing the word "Allen" as the second word of the mark.[4]  It also recently granted registration to the mark "MICHAEL ALLEN SALON" for use in association with "hair and nail salon/spa"—almost identical services as those associated with the name "John Allan's."

Finally, the nature of the limited injunctions granted by courts when a party uses his or her own name as a trademark shows that the names "Craig Allen's" and "John Allan's" are

---

[4] The PTO has granted registration for the following marks, all used in association with clothing: MEG ALLEN, MICHAEL ALLAN, CARRY ALLEN NEW YORK FOR APART, BRUCE ALAN, MARK ALAN, STEVEN ALAN, ALLEN ALLEN, SUSAN ALLEN, LAUREN ALLEN, BOB ALLEN, KENNETH ALLEN, and JUSTIN ALLEN.

distinguishable.  Courts are reluctant to enjoin a party from using his own name and will often search for ways to allow an alleged infringer to still use his name in a modified form that eliminates customer confusion.  *Id*.  As a result, when two parties have the same last name, the courts have issued limited injunctions requiring the infringer to use his first name or initials to eliminate customer confusion.  *See Rosenthal v. Ritelite, Ltd.*, 986 F. Supp. 133, 145 (E.D. N.Y. 1997) (finding that the defendant was permanently enjoined unless his surname was preceded by the name "Jacob" or "Alex" in the same type and size); *Vera v. Todo Imports, Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) (finding that the defendant can only use his surname if used in conjunction with other distinguishing words).  Based on these decisions, the names "John Allan's" and "Craig Allen's" are not similar.  If the addition of an initial or a first name eliminates customer confusion between similar surnames, then the names "Craig Allen's" and "John Allan's" are not confusingly similar to begin with because each contains a different first name.

ii.   The name "John Allan's" is a weak mark.

The name "John Allan's" is a weak mark because it is the personal name of John Allan Meing.  Personal names cannot be inherently distinctive marks and are protected only upon proof that they have acquired secondary meaning.  2 McCarthy, *supra*, § 13:2; *Marker Intern. v. DeBruler*, 844 F.2d 763 (10th Cir. 1988).  Specifically, the public must recognize the personal name "as a symbol that identifies and distinguishes the good or services of only one seller."  *Id.*; *Kingsford Products Co. v. Kingsfords, Inc.*, 715 F. Supp. 1013, 1018 (D. Kan. 1989).  Plaintiff has little evidence that anyone in Wichita, Kansas, has even heard of the name "John Allan's." Thus, the name has obviously not acquired secondary meaning in Wichita, and this factor weighs against a finding of likelihood of confusion.

      iii.  <u>Tatro's and Leschuk's intent in adopting the name "Craig Allen's" does not support a finding of likelihood of confusion.</u>

Plaintiff has no evidence that Tatro and Leschuk copied the name "John Allan's" when choosing to name their salon.  *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) (stating that proof of copying may justify an inference of likelihood of confusion).  Moreover, plaintiff has no evidence that Tatro and Leschuk intended to derive benefit or the goodwill from the name "John Allan's."  *See id.* at 156 (stating that if the evidence shows that the defendants did not intend to derive benefit from the plaintiff's mark, then this factor weighs against the likelihood of confusion).  The name "Craig Allen's" is actually Tatro's legal first and middle names.  Tatro had always wanted to name a business "Craig Allen's," and had no intention of confusing consumers into thinking that the name referred to, or even was associated with, the John Allan's clubs.

      iv.  <u>There are few similarities between plaintiff's and defendants' marketing strategies.</u>

Plaintiff and defendant operate their salons in completely separate markets, and therefore, this factor weights against a finding of likelihood of confusion.  In *T.G.I. Fridays v. Int'l Rest. Group, Inc.*, the court held that there was no likelihood of confusion between the names "Ever Lovin' Saturdays'" and "T.G.I. Friday's" because the plaintiff had never directly competed with defendant or advertised locally.  405 F. Supp. 698, 707 (E.D. La. 1975).  Similarly, Craig Allen's has never directly competed with John Allan's.  Plaintiff operates the John Allan's clubs in New York, over one thousand miles away from Wichita.  It does not operate John Allan's clubs or distribute its products in Kansas.

Further, even if plaintiff claims that it plans to expand, this does not support a finding of likelihood of confusion. *See Universal Money Ctrs. v. AT&T*, 797 F. Supp. 891, 895 (D. Kan.

1992) (holding that the plaintiff's plans for expansion do not support a likelihood of confusion if potential customers do not know of the plans).   As with plaintiff's purported trade dress, consumers in Wichita do not even recognize the name "John Allan's," and therefore, do not know of plaintiff's plans for expansion.

> v.   <u>Customers of Craig Allen's and John Allan's are likely to exercise a high degree of care when choosing a salon.</u>

"A consumer who exercises a high degree of care in selecting a product reduces the likelihood of confusion."  *Medi-Flex, Inc. v. Nice-Pak Products, Inc.*, No. 06-2015-KHV, 2006 U.S. Dist. LEXIS 17883, at *29 (D. Kan. April 7, 2006).  Buyers generally exercise little care when purchasing small items that may be bought on impulse.  *Id*.  The relevant analysis is on the consumer's degree of care at the time of purchase.  *Id*.

Both Craig Allen's and John Allan's are upscale men's grooming salons that serve business or professional men.  The services offered at the salons are not those typically offered at a men's barbershop, but include services such as manicures, pedicures, and massages.  These are not impulse purchases, but rather, are more expensive, planned purchases made by men looking for a higher level of customer service in a more masculine environment than a woman's salon.  Thus, this factor weighs against a finding of likelihood of confusion.

> vi.   <u>Plaintiff has no evidence of actual confusion between the names "Craig Allen's" and "John Allan's"</u>

The only evidence of actual confusion offered by plaintiff is associated with defendants' past, and discontinued, use of the CA circle design.  Plaintiff has no evidence of a person being confused solely by the name "Craig Allen's."  Plaintiff will offer the testimony of Steve Alvarez, Michele Wheeler, and Chad Green as evidence of actual confusion between the names, but the source of all three of these witnesses' confusion was actually the CA circle design.  Alvarez saw

no similarities between the two names.  Instead, he recognized the defendants' former CA circle design as being similar to plaintiff's JA circle design.  Furthermore, while both Wheeler and Green found similarities in the names because they contain the word "Allen's," they were not confused into thinking that they referred to the same person.  At most, they thought that the names referred to two brothers.

To summarize, plaintiff's trade name infringement claim is meritless.  Plaintiff cannot prove that potential customers see the name "Craig Allen's" in Wichita, Kansas, and associate it with the John Allan's clubs in New York.  Thus, the Court should deny plaintiff's request for injunctive relief.

### b. Defendants' new composite mark is not confusingly similar to the name "John Allan's."

Defendants new composite mark consists of the CA initials surrounded by the laurel wreath with the name "Craig Allen's" written below.  Plaintiff has stated that the new design of the CA initials is not confusingly similar to its JA circle design, but continues to bring its claim for infringement of the trade name "John Allan's."   In fact, plaintiff has essentially ignored defendants' new composite logo and focused solely on defendants' past use of the CA circle design in an attempt to bootstrap its otherwise meritless trade name infringement claim to its infringement claim of the JA circle design.

Defendants' new composite mark is not confusingly similar to the name "John Allan's" because the court will give greater weight to the design of the CA initials when evaluating the likelihood of confusion between the two marks.  While a court should not dissect a mark, if one feature is more dominant or significant, it will give greater force and effect to that feature when determining likelihood of confusion.   3 McCarthy, *supra*, § 23:42 ("It is important in determining the likelihood of confusion to give greater weight to the important or "dominant"

parts of a mark, for it is that which may make the greatest impression on the ordinary buyer.")
Here, the dominant portion of the defendant's new composite mark is the CA initials surrounded
by the laurel wreath, and plaintiff has already stated that this design is not similar to its JA circle
design.  Moreover, even if the court does compare the other portions of the mark, the names
"Craig Allen's" and "John Allan's" are not confusingly similar as well.  Thus, defendants' new
composite mark does not infringe plaintiff's trade name.

3. **Defendants discontinued use of the CA circle design and the phrases "men's service rediscovered" and "a return to a simpler time" do not entitle plaintiff to permanent injunctive relief.**

Plaintiff's trademark infringement claims for defendants' past use of the CA circle design
and the phrases "men's service rediscovered" and "a return to a simpler time" are moot.  A claim
is moot if the defendant "voluntarily reforms and ceases the complained of activities."   4
McCarthy, *supra*, § 30:11.  The defendant has the burden of persuading the court that "the
allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth,
Inc. v. Laidlaw Env. Services, Inc.*, 528 U.S. 167, 189 (2000).  In the context of trademark
infringement, the courts have held that a permanent injunction is not appropriate if "the
defendant infringed innocently, ceased before judgment, and assured the court that it has no
intent of infringing in the future."  *In re Circuit Breaker Litig.*, 860 F. Supp. 1453, 1456 (C.D.
Cal 1994); *see also Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 807
(D.C. Cir. 1987) ("When a defendant has ceased its infringing conduct and shows no inclination
to repeat the offense, a court may not issue an injunction. . . . The district court had ample reason
to find that they did not intend to infringe again.").  Because a permanent injunction is
considered extraordinary relief, courts are less willing to grant it as remedy unless the plaintiff
suffers substantial injury.  *In re Circuit Breaker*, 860 F. Supp. at 1455.

In this case, defendants have ceased all use of their allegedly infringing marks, have notified plaintiff of their cessation, and have disavowed any intent to use these marks in the future. Indeed, defendants invested substantial resources in creating an entirely new logo for Craig Allen's. They have spent a substantial amount of money producing new advertisements and promotional material to educate the public on its logo. The new logo has been well-received by the public, which is further evidence that defendants have no intention of using the CA circle design again. Moreover, defendants' initial use of the mark was based on Tatro's innocent, though perhaps misguided, belief that modeling the CA circle design after plaintiff's JA circle design was permissible.

Defendants also have no intent to use the phrases "men's service rediscovered" or "a return to a simpler time" again. Defendants innocently used these phrases, after seeing them in Troy Mitchell's marketing material and not knowing they were plaintiff's registered marks. Defendants removed the link to the article containing the phrase "men's service rediscovered" immediately from the Craig Allen's website. Further, they removed the phrase "a return to a simpler time" from their front window immediately after discovering it was one of plaintiff's registered marks and before plaintiff ever said anything about it.

Plaintiff has persisted in bringing its trademark infringement claims even though it is clear that defendants will never use the CA circle design and phrases "men's service rediscovered" and "a return to a simpler time" again. Plaintiff admits that it has not suffered substantial harm from defendants' use of these marks, yet still seeks to penalize defendants for their limited use of them. A permanent injunction is extraordinary relief, and the court should not grant this to plaintiff based solely on defendants' discontinued use of its marks.

**4. If defendants prevail, they intend to seek attorney's fees because of plaintiff's conduct in prosecuting this lawsuit.**

The Lanham Act provides that "the court *in exceptional cases* may award reasonable attorney's fees to the prevailing party." 15 U.S.C. § 1117(a) (emphasis added). In the case of a prevailing defendant, a case is exceptional because of "(1) its lack of any foundation, (2) the plaintiff's bad faith in bringing the suit, (3) the unusually vexatious and oppressive manor in which it prosecuted, or (4) perhaps for other reasons as well." *Nat'l Assoc. of Prof. Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1147 (10th Cir. 2000). The court primarily looks at the plaintiff's conduct when bringing the lawsuit and the manner in which it prosecuted the lawsuit. *Id.* at 1151.

This case is an "exceptional case" because of plaintiff's conduct in bringing the lawsuit and its manner of prosecuting it. Plaintiff has brought both frivolous and moot claims in an attempt to punish defendants for allegedly copying its JA circle design. After initially seeking a preliminary injunction, insisting on an accelerated scheduling order, and forcing defendants to incur unnecessary litigation expenses, plaintiff withdrew its preliminary injunction request after discovering it had not suffered any actual harm as a result of defendants' conduct. Plaintiff continues to seek a permanent injunction that requires defendants to stop using marks they have already ceased all use of and vowed never to use again. Moreover, plaintiff continues to prosecute its trade dress claim even though it never conceived of or enforced its alleged trade dress rights prior to discovering the existence of Craig Allen's. Because of this conduct, defendants are entitled to attorney's fees if they prevail.

**5.    Plaintiff is not entitled to attorney's fees because Tatro's and Leschuk's actions were not performed in bad faith.**

In the case of a prevailing plaintiff, an exceptional case is one in which the defendant's conduct was "malicious, fraudulent, deliberate, or willful." *Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1224 (10th Cir. 1998).  A court awards attorney's fees against a defendant when "the defendant's acts of infringement were pursued in bad faith."  *Nat'l Assoc. of Prof. Baseball Leagues*, 223 F.3d at 1148.  Even if the court finds that Tatro and Leschuk copied plaintiff's trademarks and alleged trade dress, their conduct was not malicious, fraudulent, deliberate, or willful.

The mere act of copying a protected trademark or trade dress does not create a presumption of bad faith on the part of the defendant.  3 McCarthy, *supra*, § 23:122.  Bad faith is only inferred from the act of copying with the intention of confusing consumers.  *Id*.  Here, Tatro's and Leschuk's alleged acts of copying were not performed in bad faith.  Tatro and Leschuk visited John Allan's simply to gain ideas about men's grooming salons.  They never intended to confuse consumers into thinking that Craig Allen's was a John Allan's club.  Indeed, Tatro and Leschuk both thought that Craig Allen's would be so far removed from New York that no one in Wichita would associate its interior design or the CA circle design with John Allan's. Therefore, plaintiff is not entitled to attorney's fees.

**CONCLUSION**

Plaintiff cannot prevail on its claims for trademark infringement, trade dress infringement, or unfair competition.  Therefore, defendants respectfully request that the Court deny plaintiff's request for injunctive relief.

Respectfully submitted,


By    /s/Todd N. Tedesco             
     James M. Armstrong, #09271
     Todd N. Tedesco, #15652
     Alicia E. Bodecker, #22162
     ATTORNEYS FOR DEFENDANTS

Foulston Siefkin LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, KS  67206-4466
316.267.6371 (office)
316.267.6345 (fax)


## CERTIFICATE OF SERVICE

I certify that on August 1, 2006, I electronically filed the foregoing Notice of Service

with the clerk of the court by using the CM/ECF system which will send a notice of electronic

filing to the following counsel of record:

Charles E. Millsap           cmillsap@fleeson.com

Kenneth L. Bressler          kbressler@blankrome.com

Dennis P. McCooe           mccooe@blankrome.com

Hans H. Chen                hchen@blankrome.com


/s/ Todd N. Tedesco                  
Todd N. Tedesco #15652