IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| THE JOHN ALLAN COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 05-CV-1150-MLB |
| THE CRAIG ALLEN COMPANY L.L.C., | ) | |
| CRAIG ALLEN TATRO, and | ) | |
| ERIK DAVID LESCHUK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S POST-TRIAL BRIEF

### I.      INTRODUCTION

This Post Trial Brief is submitted on behalf of Plaintiff in support of its request for injunctive relief as well as an award of attorneys fees in this trademark and trade dress case.  We will first summarize the facts adduced at trial and then discuss the law as applied to the facts. Finally, we will summarize the injunctive relief that Plaintiff believes is required to prevent continued consumer confusion due to the theft of Plaintiff's trademarks and trade dress.

### II.      FACTS

John Allan Meing, (whose first name is John Allan (Testimony of John Allan Meing, Trial Transcript page 278))[1], has been in the hairstyling business since 1978.  (Meing p. 261)  He founded John Allan's in 1988 as a men's grooming establishment with an old world men's club atmosphere.  (Meing pp. 272-73, 280, 282-83).  John Allan's was (and still is) unique and Mr. Meing was quickly recognized as a leader in the men's grooming industry.  (Meing p. 283)  In 1990, Mr. Meing was named by *Entrepreneur Magazine* as one of the top forty entrepreneurs

---

[1]      References to the trial transcript as well as testimony submitted by deposition will be ([witness] p.___).

under forty years old. (Meing pp. 297-99; Ex. 156 at p. 190) He, his clubs, and his products have received widespread media coverage over the past 18 years, including national television shows such as *CNN Headline News, Weekend Today* and *Good Morning America*,[2] and more than 125 articles in newspapers and magazines, including *GQ, Esquire, Men's Health, Women's Wear Daily, Bride's, People, Fortune, Cigar Aficionado, The New York Times* and *Daily News*. (Meing pp. 297-98, Ludvigsen pp. 534-35; Exs. 155, 156 at pp. 0001-0002, 0011, 0014, 0016, 0017, 0018, 0020, 0030, 0043, 0054-56, 0063, 0067, 0068, 0070, 0081-82, 0125, 0128-30, 0131, 0149, 0173-75, 0183-87, 0191-92, Exs. 157, 158)

There currently are two John Allan's clubs. The Downtown Club, which is in the Wall Street area, was the first John Allan's (after moving from a nearby location). The Midtown Club is around the corner from Grand Central Terminal and embodies the same old-world men's club feel as the Downtown club.[3] (Meing p. 289) In addition, John Allan's has pursued space in Chicago, Illinois; has a letter of intent in place to open a club in Atlanta, Georgia; and executed a non-disclosure agreement with a potential partner in Philadelphia, Pennsylvania. (Ludvigsen pp. 542-3; Ex. 122)

John Allan's clubs have customers from 49 states, including Kansas. (Ludvigsen pp. 533-34; Ex. 106) In addition, John Allan's has received inquiries from people in California, Illinois, Massachusetts, New Jersey, North Carolina, Pennsylvania, and Texas, as well as Ireland,

---

[2]     In addition to the television show listed on Exhibit 157, Mr. Meing estimates he has been on television another six or seven times. (Meing pp. 296-97)

[3]     After this case was filed, a John Allan's was opened at Saks Fifth Avenue in Manhattan. The facility at Saks is not a John Allan's Club due to the need to adhere to space and design restrictions specific to Saks. And in February 2006, Plaintiff opened a facility in Tribeca, which is a combination training facility, wholesale and retail center for John Allan's products, and John Allan's Club. While the overall look and feel of the John Allan's facility in Tribeca is more modern than the Midtown and Downtown locations, it still contains many of the unique trade dress elements found in the other John Allan's Clubs. (Meing pp. 306-310) Plaintiff is not seeking to protect the trade dress of the Saks and Tribeca facilities in this litigation.

Kuwait, and Singapore, asking if there is or will be a John Allan's in those locations or if there are opportunities to open a John Allan's franchise there.  (Ludvigsen pp. 541-2; Exs. 123-41)

In addition to services, John Allan's sells men's shaving, hair care and skin care products under the JOHN ALLAN'S mark that are distributed through John Allan's locations and through 120 independent retail outlets in 24 states plus the District of Columbia, including at Barney's, Nordstrom's and Saks.  John Allan's has had discussions with people in Kansas about selling its products.  (Ludvigsen pp. 541-42, 560; Ex. 142)

John Allan's promotes its services and products at "retail events" where John Allan's re-creates the look and feel of a John Allan's club in a department store and provides services to customers.  (Meing pp. 312-17)  Such events have been held, among others places, in Beverly Hills, California; Seattle, Washington; Miami, Florida; Chevy Chase, Maryland; Short Hills, New Jersey; and Stamford, Connecticut.  (Meing pp. 312-316; Exs. 110-112, 115-16, 118)

There are many men's salons in the United States that have sought to take advantage of the demand for upscale men's services like those offered by John Allan's.  Mr. Meing and his company encourage others to enter the business and have gone as far as to give advice to would-be competitors.  (Meing pp. 325-29)  Except for Defendant Craig Allen's and Troy Mitchell's, the latter of which admittedly copied John Allan's trade dress and closed after receiving a second cease and desist letter from John Allan's, all of the other men's salons have their own unique name and look and feel.  (Meing pp. 325-26; Mitchell pp. 66-9; Macary pp. 494-97; Exs. 91, 96) For example, the July 6, 2006, *New York Times* article titled "Putting the Man in Manicure" shows pictures of three other men's salons.  None look anything like the John Allan's clubs. (Ludvigsen p. 535; Ex. 156 at pp. 0001-02).  In an article in *AmericanWay* magazine, the Grooming Lounge, another leader in the industry, is pictured.  It too looks nothing like John

Allan's.  (Tatro p. 22; Ex. 156 at p. 0114).  And there is an establishment in Wichita, Kansas called Sports Clips, that has a sports theme and looks nothing like John Allan's.  (Meing pp. 325-6)

The individual Defendants had no prior experience in the hairstyling or grooming business.  (Tatro p. 6)  They had to hire a hair stylist to explain how to cut hair, handle tipping, schedule appointments, and determine the personnel who, for example, should shampoo the clients.  They also had to hire a cosmetologist to show them how to order supplies.  (Tatro pp. 6-7)

Before opening Craig Allen's, the individual defendants knew that John Allan's was one of the most well-known men's grooming establishments in the United States and was known nationally for its expert men's haircuts.  (Tatro pp. 22, 33-5; Ex. 58 at p. 1822)  They did almost everything they could to learn about John Allan's.  They read articles about John Allan's, reviewed the John Allan's website many times and printed pages from that site, visited John Allan's two clubs, received services there, without permission took photos of the interior and exterior of the two John Allan's clubs, took marketing materials, and drew a sketch of the interior of the Downtown Club on the back of a piece of John Allan's marketing materials.  (Tatro pp. 21-33, 45-50; Exs. 1-3, 6-8, 10-11, 14-16, 19-21, 23-24, 26)  The only thing Defendants did not do was to speak to Mr. Meing, despite his being present when they visited John Allan's as evidenced by his being in one of the photographs they took, and despite defendants having spoken to the owners of the other men's salons they visited.  (Tatro p. 27; Leschuk pp. 202-03)

Defendant Tatro told the designer of Craig Allen's corporate image (Jeremy Luginbill) that he liked the look and feel of John Allan's and how it was presented to the public and

4

"wanted to emulate [the] appearance here in Wichita".  (Luginbill p. 165)  When the designer,

troubled by the "moral dilemma" of copying another company's designs, suggested new ideas,

Tatro told him "don't fix it if it's not broken."  (Luginbill p. 166-68).  When the designer

expressed concern that he was copying, Tatro implied that he was working with John Allan's and

that John Allan was "in the loop."  (Luginbill pp. 165-69)  When the designer created a website

for Craig Allen's that did not have a "watermark" of the Craig Allen's logo like the watermark

on John Allan's website, Tatro told the designer he "was being pig-headed" in objecting to

copying the watermark.  (Luginbill pp. 172-73; Exs. 32-33)  And on numerous occasions when

Luginbill offered his opinion, Tatro told him, "don't reinvent the wheel."  (Luginbill p. 173)

Defendants then copied almost every aspect of the John Allan's clubs, including:

- The John Allan's name;

- The John Allan's logo (Tatro p.  39-40, 154; Luginbill pp. 166-67; Exs. 48-51);

- The registered trademarks A RETURN TO A SIMPLER TIME and MEN'S SERVICE REDISCOVERED. (Tatro pp. 50-51; Exs. 87, 90);

- The overall trade dress of John Allan's clubs, including the following individual elements: exterior frosted glass windows with phrases etched in them, including Plaintiff's trademark A RETURN TO A SIMPLER TIME, black smocks for shoeshine personnel, black smoking jackets for patrons to wear, a pool table, bar, oriental rugs, low-cut club style chairs for patrons to sit in double sided cutting stations, providing haircuts and manicures simultaneously by women who sit in wheeled stools, low tables for drinks, vintage barber chairs for hot towel treatments, shoeshine stand, cigar room,

soothing low tempo music and the circular logo etched glass in the club.
(Meing pp. 321-24; Exs. 42-44, 50-55A)  While not listed as elements of trade
dress, Defendants also copied Plaintiff's ice buckets with stone in them for
pedicures, chairs for pedicures, chess boards and mirrors in large picture
frames.  (Meing pp. 292-93, 323);

- The John Allan's website (Exs. 6, 7, 8, 32, 33);

- The John Allan's shopping bags and stickers (Tatro pp. 31, 51-52; Exs. 200-02);

- The John Allan's business cards (Ex. 171); and

- John Allan's membership program and overall business.

Defendant Tatro has a compulsion to copy other people's work and to lie about his
misdeeds.  *After* being sued in this case he committed copyright infringement by copying articles
concerning men's grooming written by experts in the field.  He published the articles under his
own name in a magazine called *Splurge!* and on the Craig Allen's website.  (Tatro pp. 7-20;
Ex. 34 at pp. 02987, 02978, 2967, 02964, 02984, 02981; Ex. 181)[4]  He even went as far as
copying the biography of the founder of the Grooming Lounge (one of the other well known
men's establishments) and substituting his own name for the founder's.  (Ex. 34 at pp. 02966,
20967, 20972, 02975, 02976, 20978, 20981, 02984; Tatro pp. 19, 22)  When confronted at trial,
Tatro initially lied to the Court and claimed that he did write the articles.  After being shown
proof that he copied one article from the Grooming Lounge, he relented, and admitted copying
that article.  But then he continued to lie and insist that he wrote two other articles until he was
presented with proof that he copied those articles as well.  (Tatro pp. 7-20; Ex. 181)  Tatro lied to

---

[4]      Suit was filed on May 19, 2005.  Tatro copied articles in August 2005, September 2005, October 2005,
December 2005, April 2006 and May 2006.  (See Ex. 34 at p. 02961)

the Court about copying the Grooming Lounge article even though he was confronted five months before trial by the owner of the Grooming Lounge, who told Tatro that had no right to copy the article and that had he had to take it off his website.  (Tatro pp. 8-9)  Not only did Tatro leave the copied article on his website, he continued to copy other articles and claim them as his own.

Defendant Leschuk claims to have been innocent, testifying that he would not have agreed to use the circular Craig Allen's logo had he known that the John Allan's logo was registered as a trademark.  (Leshuk pp. 215, 240)  But on cross-examination, Leschuk was confronted with six documents he had possession of before adopting the Craig Allen's name and logo that indicated that the John Allan's name and logo was a registered trademark.  (See ® on Exs. 6, 7, 8, 16, 19 and 21.  *See also* Exs. 11, 17, 23, 25 and 26 (all of which were in Defendants possession prior to opening Craig Allen's); Leschuk pp. 238-42)

On cross-examination, Leschuck admitted that ***prior*** to the time he and Tatro opened Craig Allen's, he knew that Wichita resident Steven Alvarez was confused into thinking that Craig Allen's was one and the same as John Allan's.  (Leschuk p. 204)  Alvarez testified that he asked Leschuk if Craig Allen's was a franchise of the men's club in New York and was told "no, that's John Allan's."  (Alvarez pp. 30-31)[5] Alvarez went on: "there was an uncomfortable silence" and Leschuk and Tatro had a "deer with the headlight look."  (Alvarez p. 31)  Finally, ***prior*** to opening Craig Allen's, Leschuk told Luginbill (the person hired to develop Craig Allen's corporate image) that he was concerned that Craig Allen's corporate identity was too

---

[5]     Alvarez identified Leschuck in Ex. 9.  (Alvarez Tr. pp. 28-29)

similar to John Allan's and Troy Mitchell's[6] and that they would thus be prevented from expanding Craig Allen's nationwide.  (Luginbill pp. 169-70)

Craig Allen's targets business travelers from around the country in its advertising, including by advertising in magazines that are given to hotel guests at 47 hotels in the Wichita area.  According to Tatro, "business travelers from all over the country make Craig Allen's a mandatory stop while in Wichita."  (Tatro p. 56)  The articles that Tatro copied were published under his name in *Splurge!* magazine, which is one of the magazines given to hotel guests. (Tatro pp. 56-58; Ex 70; Leschuk pp. 208-10)  As of November, 2005 Craig Allen's had customers from 27 states.  (Ludvigsen p. 534; Ex. 66)  Defendant Leschuk was asked if it would franchise its clubs and responded that it is possible.  (Leschuk p. 214)

There have been at least four people who have experienced actual confusion between Craig Allen's and John Allan's.

Steven Alvarez testified by deposition.  He lived in Wichita all his life.  He travels every week for business.  In April 2004, he was in New York City and was taken by a client to John Allan's.  He had never seen a facility like John Allan's.  (Alvarez pp. 7-19)  In August 2004, he was in a frame shop in Wichita and saw a logo for Craig Allen's including the Craig Allen's name.  He had forgotten the full name of John Allan's and thought this was the same company opening a club in Wichita.  The individual defendants were in the office above the frame shop. Alvarez asked them if their club was a franchise of "the one in New York."  There was a uncomfortable moment of silence.  They replied, "No, that's John Allan's."  (Alvarez pp. 24-31) This occurred before Craig Allen's opened.  (Leschuk p. 204)

---

[6]      Troy Mitchell's also copied much of John Allan's look and feel without permission.  See discussion below at pp. 24-25

Chad Green also testified by deposition.  Green grew up in El Dorado, Kansas.  He moved to New York City in early 2006.  Prior to moving to New York, he visited Craig Allen's on three occasions.  He thought that Craig Allen's was unique and distinct.  Mr. Green walked past the Midtown John Allan's and thought it looked like Craig Allen's.  This was due to the logo, the font, the product and the pictures in the window.  As he needed a haircut he went inside.  Mr. Green testified that the inside of John Allan's looked very similar to Craig Allen's. He asked a stylist at John Allan's if they were owned by the same person who owned Craig Allen's.  (Green pp. 1-12)

Michelle Wheeler testified at trial.  She is a resident of Wichita, Kansas.  She owns a day spa.  Ms. Wheeler heard of Craig Allen's after seeing articles about it and seeing it at a job fair. She was in search of men's products and a friend gave her an advertisement from a magazine about John Allan's and its products.  She called John Allan's in New York to ask if John Allan's products were available at its Wichita location.  (Wheeler pp. 246-250)  After being told that Craig Allen's was not related to John Allan's, she became curious and looked at the John Allan's and Craig Allen's websites.  She was surprised how much they looked alike.  (Wheeler pp. 251)

Chip Chimera testified by deposition.  He is a member of the Midtown John Allan's Club.  He was in Wichita visiting a friend in April 2006 and was taken to Craig Allen's.  The first thing he thought when he saw the outside of Craig Allen's was that it looked just like John Allan's.  This was based on the logo and the frosted glass windows with phrases etched in them. When he went inside he thought that the interior was identical –  that it was an exact replica of John Allan's, from the way the products are arranged, to the way the women are dressed, the leather chairs, shoe shine station, pool table, center cutting stations, menu of services and pictures on the wall.  (Chimera pp. 6, 7-9)

9

Plaintiff sent its first cease and desist letter to Defendants on March 7, 2005, just three months after Craig Allen's opened.  (Tatro p. 58; Ex. 72)  Defendants initially refused to cease any of their infringing activities.  (Meing p. 319)  Defendants did not take down the sign with the infringing logo until the day Plaintiff filed suit.  (Meing pp. 319-20; Trial Transcript p. 189 (counsel for Defendants addressing the Court))  Mistakes were made and the original Craig Allen's logo was used by third parties after Craig Allen's ceased its use.  (Tatro pp. 58-59)

### III.   ARGUMENT

**A.   Craig Allen's Infringes the John Allan's Trademarks**

The purpose of a trademark is to identify a producer's goods and distinguish them from those of other producers.  *Beer Nuts, Inc. v. Clover Club Foods Co*., 805 F.2d 920, 924 (10th Cir. 1986) (hereinafter, "*Beer Nuts II*").  *See also Beer Nuts v. Clover Club Foods Co*., 711 F.2d 934, 938 (10th Cir. 1983) (hereinafter "*Beer Nuts I*") (a term is used as a trademark when the manufacturer uses it to identify the source of its goods to the public and to distinguish those goods from others.)

To prevail on a claim of trademark infringement, Plaintiff must prove that it has a protectable trademark and that the allegedly infringing mark "'is likely to cause confusion' in the marketplace concerning the source of the different products."  *Beer Nuts II*, 805 F.2d at 924; *see also* 15 U.S.C. § 1114(1)(a).

### 1.   John Allan's Marks are Protectable

Plaintiff is the owner of the mark, JOHN ALLAN'S & JA Circle Design, which has been in continuous use since at least as early as 1991.  (Meing p. 282)  On January 30, 1996, the JOHN ALLAN'S & JA Circle Design mark was accorded Federal Registration Number 1,953,346, for "men's and women's haircutting services, namely haircutting, manicures, facials, and massage services; retail counter in the field of hair and skin products."  This federally

registered mark has been in continuous use for more than five years and has acquired "incontestable status."  (Ex. 88) *See* 15 U.S.C. § 1065.

In addition, Plaintiff owns common law trademark rights in the term JOHN ALLAN'S which mark and name it has been using continuously since at least as early as 1988.  (Meing p. 282)

Plaintiff also owns common law service mark rights in a distinctive circle logo consisting of the letters "J" and "A" in a stylized font (the "JA Circle Design").  This mark has been in continuous use since at least as early as 1991.  (Meing p. 282)

Plaintiff is the owner of the federally registered mark, MEN'S SERVICE REDISCOVERED, for "beauty salons and health spa services."  The mark was registered on December 21, 2004, and was accorded Federal Registration Number 2,912,311.  (Ludvigsen p. 542; Ex. 90)  The registration is valid, subsisting, and in full force and effect.

Plaintiff is the owner of the federally registered mark, A RETURN TO A SIMPLER TIME, for "beauty salons and spa services."  The mark was registered and was accorded Federal Registration Number 2,853,312 on June 15, 2004.  (Ludvigsen p. 542; Ex. 87)

Finally, Plaintiff is the owner of the mark, JA JOHN ALLAN'S, for "hair care products; namely, exfoliants for hair, hair gel, hair bleach, hair bleaching preparations, hair care preparations, hair color, hair lighteners, hair lotions, hair mousse, hair pomades, hair styling preparations, hair waving lotion; conditioners and shampoos; and skin care preparations namely, skin lotions, skin creams, soaps and facial cleaners."  The mark was registered on August 30, 2005, and accorded Federal Registration Number 2,988,501.  (Ludvigsen p. 542; Ex. 89)

2.      There is a likelihood of confusion between John Allan's and Craig Allen's

In determining whether a likelihood of confusion exists, the court considers the following non-exhaustive factors:  (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers;  and (6) the strength or weakness of the marks.  *See Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002); *see also King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089-90 (10th Cir. 1999).  "These factors are interrelated and no one factor is dispositive."  *Sally Beauty Co.*, 304 F.3d at 972.

A.      Degree of Similarity.

There can be no dispute that Defendants' infringing marks, namely the CA Circle Design, the CRAIG ALLEN'S name, The Craig Allen Company LLC corporate name, the <craigallens.com> domain name, the CRAIG ALLEN'S & CA Circle Design, A RETURN TO A SIMPLER TIME, and MEN'S SERVICE REDISCOVERED are substantially identical to Plaintiffs marks.

In evaluating the degree of similarity, it is inappropriate for the Court to conduct a side-by-side comparison of the two marks.  *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987); *Beer Nuts I*, 711 F.2d at 941.  Instead, the Court must determine whether the allegedly infringing mark will confuse the public when singly presented.  *Sally Beauty Co.*, 304 F.3d at 972.  (Based on this basic premise of trademark law, Plaintiff objects to the admission in evidence of Exhibits 533 and 534.  *See* Trial Transcript pp. 123-25)

"The entirety of a registered trademark need not be appropriated before infringement may be found, if the portion appropriated by the defendant is sufficient to cause a likelihood of

confusion as to source, sponsorship, or affiliation.  Exact duplication of a registered trademark is not required before the court may find that the trademark has been infringed.  In other words, the two marks need not be identical to establish liability for trademark infringement." *Universal Motor Oils Co. v. Amoco Oil Co.*, 15 U.S.P.Q.2d 1613, 1619 (D. Kan. 1990) ("*Universal Motor I*").

Moreover, "similarities are weighed more heavily than differences, particularly when the competing marks are used in virtually identical products packaged in a similar manner." *Sally Beauty Co.*, 304 F.3d at 974-75 (citing *Beer Nuts II*, 805 F.2d at 925); *see also King of the Mountain Sports*, 185 F.3d at 1090; *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994); *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993).

Where the services are directly competitive, the degree of similarity required to prove trademark infringement is less than in the case of dissimilar services.  *Sally Beauty Co.*, 304 F.3d at 974-75; *See RJR Foods, Inc. v. White Rock Corp.*, 201 U.S.P.Q. 578, 1978 U.S. Dist. LEXIS 15080 (S.D.N.Y. 1978), *aff'd*, 603 F.2d 1058 (2d Cir. 1979).

When viewed as a whole, "Craig Allen's", which is used for identical services as those offered by Plaintiff under the John Allan's mark, is very similar to "John Allan's."

B.    Intent.

"Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion." *Sally Beauty Co.*, 304 F.3d at 973 (citing *Beer Nuts I*, 711 F.2d at 941).  *See also Jordache*, 828 F.2d at 1486 (evidence that the defendant deliberately adopted a mark similar to plaintiff's mark supports the inference that the defendant intended to confuse the public).  *See also Paddington Corp.*, 996 F.2d at 586 ("Where

a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion").

There can be no doubt that Defendants intentionally copied the John Allan's trademark:

- Defendants were not only aware of the John Allan's mark's, they were aware that John Allan's was one of the most well-known businesses in the men's grooming area, earning significant media attention both in consumer publications and industry publications such as *Modern Salon* (Tatro p. 36; Ex. 156);

- While Tatro's full name is Craig Allen Tatro, he goes only by Craig Tatro. He never uses his middle name, either in business or personally.  (Tatro, pp. 38-9).  Incredibly, his friend and business partner of twenty years – Defendant Leschuk – did not even know that Allen was Tatro's middle name (Tatro pp. 38-9); and

- Defendants did not consider using any name other than Craig Allen's (Tatro p. 36)

There also is no question that Defendants intentionally copied the John Allan's logo:

- Defendant Tatro admitted that the fact that they are similar is no coincidence (Tatro p. 154);

- Tatro designed the Craig Allen's logo after seeing the John Allan's logo. (Tatro p. 39); and

- Non-party Jeremy Luginbill, who designed the corporate image for Craig Allen's, testified that Tatro provided him with logo-bearing John Allan's materials and directed him to John Allan's website.  Luginbill also testified

that Tatro told him that Tatro liked the look and feel of the two companies and how they were presented to the public, and that Tatro wanted to emulate the appearance in Wichita.  (Luginbill p. 165)

Tatro admits that he copied Plaintiffs mark MEN'S SERVICE REDISCOVERED from Plaintiff.  (Tatro p. 51)

And there is no question Defendants intentionally copied Plaintiff's mark A RETURN TO A SIMPLER TIME:

- The registered phrase is etched in the frosted glass on John Allan's Midtown Club (Tatro p. 49; Ex. 54 at p. 01); and

- Tatro admits he copied it either from John Allan's or Troy Mitchell's.  (Tatro p. 51)

This factor thus favors a finding of likelihood of confusion.

C.      Evidence of Actual Confusion.

Actual confusion in the marketplace may be the best indicator of likelihood of confusion. *See King of the Mountain Sports*, 185 F.3d at 1092.  Although evidence of actual confusion is rare, *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1119 (6th Cir. 1996), there are four instances of actual confusion here as described in full above.  As related to the name: non-party witness Steven Alvarez, a resident of Wichita, Kansas who travels often for business and visited John Allan's on a business trip to New York, testified that prior to the time Craig Allen's opened he saw the Craig Allen's logo and name in a frame shop in Wichita and thought that it was a franchise of the men's club in New York.  According to Alvarez, he knew the name of the club in New York was "something Allan" and upon seeing the Craig Allen's name and logo, thought it was the same company.  (Alvarez p. 7, 8-9, 13, 23, 24-25)  And

nonparty Chad Green, who is from El Dorado, Kansas, and who now lives in New York, testified

that he was taken to Craig Allen's by his family. When in New York he went to John Allan's

and thought that they were owned by the same people. The first thing that came to mind was the

name. (Green p. 11).

This factor also favors a likelihood of confusion.

D.      Similarity of Products and Marketing.

The greater the similarity between the products or services, the greater the likelihood of

confusion. *Universal Motor Oils I*, 15 U.S.P.Q.2d at 1620; *Universal Money Ctrs.*, 22 F.3d at

1532. The services offered by the parties are identical. Defendants' website describes Craig

Allen's as offering, among other services, hair cuts, shoe shines, scalp and full body massages,

hot towel treatments and manicures. The John Allan Company offers all of these identical

services. (Tatro p. 106; Meing pp. 276, 278, 280, 292) And, as discussed above, Defendants

market their services at hotels in Wichita, the result of which is that "business travelers from all

over the country" go to Craig Allen's. (Tatro p. 56)

This factor indicates that there is a likelihood of confusion.

E.      Degree of care exercised by consumers.

In analyzing the degree of care likely to be exercised by purchasers, the Court should

focus on the attention usually given by the ordinary purchaser in buying the particular type of

goods or services. *Beer Nuts I*, 711 F.2d at 941. "If the relevant buyer market consists of both

discriminating and casual purchasers, the court must give consideration to likely confusion of the

casual, ordinary buyers." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

*Competition* (hereinafter "*McCarthy*") § 23:28 (2007). Given that the businesses have virtually

the same appearance and offer identical services, the sophistication of purchasers cannot be

relied upon to differentiate between the parties. *See Champions Golf Club, Inc.*, 78 F.3d at 1121. Indeed, such sophistication may actually increase confusion. *See PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F. Supp. 394, 409 (S.D.N.Y. 1989). Here, relevant consumers are all men. (Meing p. 283; Tatro p. 56) Thus, this factor favors neither party.

      F.     <u>Strength of Mark</u>.

A mark's "strength" is measured along a continuum from weakest to strongest: generic, descriptive, suggestive, arbitrary, and fanciful. *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004). A fanciful or arbitrary mark "bear[s] no relationship to the product or service with which [it] is associated." *Beer Nuts I*, 711 F.2d at 939. A suggestive mark requires "imagination, thought and perception to reach a conclusion as to the nature of goods." *Id.* A descriptive mark "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* A generic mark is a "particular genus or class of which an individual article or service is but a member." *Id.*

The stronger the mark, the greater the likelihood that encroachment on it will cause confusion. *King of the Mountain Sports*, 185 F.3d at 1093.

The John Allan Company's marks are extremely strong marks because they either: (a) are inherently distinctive, such as the registered marks JOHN ALLAN'S & JA Circle Design and MEN'S SERVICE REDISCOVERED, as well as the unique JA Circle Design logo; or (b) have acquired distinction, or secondary meaning, by virtue of having been used for more than a decade in connection with men's grooming services. (Meing p. 282)

In this regard, the registered mark JOHN ALLAN & JA Circle Design has reached incontestable status, which creates an irrebuttable presumption that the mark is inherently distinctive. *Bayer Healthcare LLC v. Nagrom, Inc.*, 72 U.S.P.Q.2d 1751, 1754, 2004 U.S. Dist.

LEXIS 19454 (D. Kan. 2004);  *Heartland Corp. v. Sifers*, No. 02-CV-2136, 2002 U.S. Dist. LEXIS 13581, at *16 (D. Kan. July 12, 2002) ("After the five years, the trademark becomes incontestable, meaning there is conclusive evidence of its distinctiveness.").  Likewise, the registered mark MEN'S SERVICE REDISCOVERED is, as a matter of law, presumed to be inherently distinctive.  *See generally GTE Corp. v. Williams*, 904 F.2d 536, 538 (10th Cir. 1990).

The common law mark "John Allan's" has acquired distinctiveness, or secondary meaning, as evidenced by the following relevant factors.  *See Western Chem. Pumps, Inc. v. Superior Mfg., Inc.*, 989 F. Supp. 1112, 1120-21 (D. Kan. 1997) (citing cases).

- *A history of successful sales*.  John Allan's has been in business since 1988 and had sales of $3 million in 2005.  (Macary p. 507)  The mark is also used on products, which are sold across the country at stores such as Nordstrom, Saks Fifth Avenue and Barneys.  (Meing pp. 302, 309, 455, Ex. 142)

- *Widespread and unsolicited media coverage*.  The JOHN ALLAN'S marks have acquired distinction due to widespread acclaim from the public and the media.  The JOHN ALLAN'S marks have been featured in nationally televised television programs, including *The Today Show* and *Access Hollywood* on NBC, as well as on programs on CNN, the Fine Living Channel and the Style Network, all of which were broadcast in Wichita.  Feature stories have appeared in print media with national circulations including *GQ, New York Magazine, Cigar Aficionado, Time Out, The New York Times, Men's Journal* and *The Robb Report*.  In the early nineties, even before John Allan opened a second salon, *Entrepreneur Magazine* named Mr. Meing as one of their "Top 40 Under 40," catapulting him to the status of an innovator

and pioneer in the men's grooming industry.  (Meing pp. 298-99; Ludvigsen

p. 541; Ex. 156 at p. 0190)

- *Exclusivity and length of use of the mark since 1988*.  Except for Craig
   Allen's, there are no other confusingly similar names in use in the men's
   grooming industry; and

- *Evidence of intentional copying by the Defendants*.  There can be no question
   that Defendants intentionally copied the John Allan's marks.

This final factor also favors a finding of likelihood of confusion.

**B.**    **Defendants Infringe Plaintiff's Trade Dress**

Trade dress consists of the "total image" of a product or package as defined by its overall

composition and design, and may include features such as size, shape, color or color

combinations, texture, graphics, and even particular sales techniques.  *Two Pesos, Inc. v. Taco

Cabana, Inc.*, 505 U.S. 763, 767-68 (1992).

To prevail on a claim of trade dress infringement, Plaintiff must prove: (1) that its trade

dress is distinctive, (2) not functional, and (3) creates a likelihood of confusion.  *See Vornado Air

Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502-03 (10th Cir. 1995); *Hartford

House*, 846 F.2d 1268, 1273 (10th Cir. 1988); *see also* 15 U.S.C. § 1125(a); *Wal-Mart Stores,

Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  If a trade dress is found to be inherently

distinctive, it is not necessary to prove secondary meaning.  *Two Pesos*, 505 U.S. at 776.

1.    Plaintiff's Trade Dress is Inherently Distinctive

Where the trade dress is a combination of many factors and encompasses the overall look

and feel of a business, courts look to the trade dress as a whole to determine if it is inherently

distinctive.  *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31-32 (2d Cir.

19

1995).  If the trade dress is classified as fanciful, arbitrary, or suggestive it is deemed inherently distinctive and entitled to protection.  *Two Pesos*, 505 U.S. at 768.  A fanciful or arbitrary trade dress "bear[s] no relationship to the product or service with which [it] is associated."  *Beer Nuts I*, 711 at 939.

Trade dress consisting of a store's interior design or décor "normally *is* taken by the consumer to indicate origin."  *See Samara Bros.*, 529 U.S. at 215 (emphasis in original); *see also Best Cellars Inc. v. Grape Finds at DuPont, Inc.*, 90 F. Supp. 2d 431, 451-52 (S.D.N.Y. 2000) (trade dress consisting of interior décor is inherently distinctive and thus protectable).  In *Two Pesos*, the Supreme Court upheld the district court's finding that the plaintiff was entitled to protect a trade dress described as follows: "a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals.  The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors.  The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes.  Bright awnings and umbrellas continue the theme." 505 U.S. at 765.

Plaintiff's trade dress is more distinctive than that found to be protectable in *Two Pesos*. Because consumers encountering the trade dress would find that it evokes an old-world men's club, not a barber shop or hair salon, the John Allan's trade dress is fanciful or arbitrary and is entitled to protection.  *Hartford House*, 846 F.2d at 1272.  Indeed, John Allan's was intentionally designed to contain elements not found in a traditional hair salon, such as low-cut chairs, and to exclude traditional aspects of a barber shop, such as a striped pole.  (Meing pp. 272, 275) Defendant Leschuk admitted that it was unusual to have a shoeshine stand, oriental rugs, black cutting jackets, low-cut leather chairs for haircutting services and frosted glass in such a

business.  (Leschuk pp. 212-13)  And Lynn Mitchell testified that he thought John Allan's was unique.  (Mitchell p. 66-69)

Defendants have argued that John Allan's is not entitled to trade dress protection because Plaintiffs' trade dress is not consistently used at the downtown and midtown clubs.  But the issue is not whether each and every item is *identical* in the two John Allan's clubs, but whether there is a "consistent overall impression."  For example, in *Best Cellars*, which was cited with approval in *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021 (D. Minn. 2003), the court found that although the décor differed somewhat in each of the plaintiff's wine stores, the different elements did not "change the overall look and feel established in the prototype New York store". 90 F. Supp. 2d at 453.  *See also Wal-Mart Stores, Inc. v. Samara Bros.*, 165 F. 3d 120, 129 (2d Cir. 1998) (variations in the trade dress elements through the years are inevitable, the question is whether the trade dress presents a consistently recognizable and continuous commercial impression), *rev'd in part*, 529 U.S. 205 (2000); *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000) ("As the District Court stated 'a party may have trade dress rights even though there are slight variations in its package design so long as the change does not alter the distinctive characteristics and the trade dress conveys a single and continuing commercial expression.'").

Defendants also argue that the John Allan's Saks and Tribeca facilities have a more modern look than the clubs.  But plaintiff is not seeking to protect the trade dress of those locations.  *See*, *e.g.*, *Rose Art*, 235 F.3d at 175 ("We conclude that when applying the 'consistent overall look' standard, that is, when determining whether the trade dress alleged by the plaintiff is recognizable, protectable trade dress, a trial court should consider only the products or packaging for which the plaintiff is seeking trade dress protection.") (citing *Regal Jewelry Co. v.*

*Kingsbridge Int'l, Inc.*, 999 F. Supp. 477, 486-90 (S.D.N.Y. 1998) (determining whether alleged trade dress had a consistent overall look by evaluating only the six novelty items at issue despite the fact that the plaintiff distributed almost 200 different novelty items)); *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) (applying *Rose Art* and the "consistent overall look" standard).

Just as the trade dress in Pizza Hut's red-roofed restaurants is protectable despite the fact that it differs in overall appearance from Pizza Hut's "booths" at airports and malls, so can Plaintiff seek protection only for the trade dress in its Midtown and Downtown clubs, although those clubs differ in appearance from the Saks and Tribeca locations (neither of which is a true club). *See Rose Art*, 235 F.3d at 174 ("The fact that Rose Art uses a variety of packages for a product such as traditional crayons would be fatal to Rose Art's case if Rose Art claimed that all traditional crayons were packaged in Rose Art's Primary Color Packaging, but Rose Art makes no such claim. Certainly the fact that Rose Art packages the same product in several different types of packaging does not prevent Rose Art from seeking trade dress protection for one of these packaging designs."). To use the iconic example cited in *Rose Art*, "Coca-Cola bottles would certainly be, at a minimum, recognizable trade dress despite the fact that Coca-Cola is also packaged in cans and that the design of a Coca-Cola bottle in no way resembles the design of a Coca-Cola can". *Rose Art*, 235 F.3d at 174 n.10.

2.   Functionality

Functionality turns on whether "protection of the *combination* would hinder competition or impinge upon the rights of others to complete effectively." *Hartford House*, 846 F.2d at 1273 (quoting *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 519 (10th Cir. 1987)). The

availability of alternative, appealing designs is a "key factor" in determining whether a trade dress is non-functional.  *Hartford House*, 846 F.2d at 1272-73.

Defendants have never suggested, nor could they, that there are not alternative designs to the John Allan's trade dress for a men's salon.  To the contrary, as discussed above, the evidence introduced at trial shows that many other men's salons offer similar services but look nothing like John Allan's (and Craig Allen's).

Moreover, John Allan's trade dress is not by nature functional.  For example, the club chairs that patrons sit in while receiving services make haircutting unusually difficult because they cannot be raised and lowered to bring the customer closer to the person giving the haircut. (Meing p. 274-75).  Other elements, such as oriental rugs, a shoe shine stand, pool table and bar have nothing to do with facilitating haircutting.

3.      Likelihood of Confusion

As with trademarks, in determining whether there is a likelihood of confusion, courts look to the following factors:

a.      Degree of Similarity

In determining similarity of trade dress, courts are cautioned not to engage in a minute dissection of the various elements, but rather to focus on the "general impression conveyed to the public" by the appearance of the trade dress.  *Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F. Supp. 2d 60, 78 (S.D.N.Y. 2003) (quoting *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (citing cases).  "In the trade dress context, the relevant inquiry is whether there is a likelihood of confusion resulting from the *total image and impression* created . . . on the eye and mind of an ordinary purchaser."  *Sally Beauty Co.*, 304 F.3d at 979 (internal citation omitted)

(emphasis added).  And as with trademarks, when comparing the parties' trade dress, each is to be viewed singly, not side by side.  *Id.* at 979.

Where identical services are offered, the similarity need not be as great to prove confusion as if completely different services were offered.  *Fotomat Corp. v. Cochran* , 437 F. Supp 1231, 1243-44 (D. Kan. 1977).  It is clear that Craig Allen's is very similar in its overall look to the John Allan's clubs.

b.    <u>Intent</u>

Where the defendant had knowledge of plaintiff's prior rights and intentionally copied plaintiff's trade dress, courts routinely find that the infringer endeavored to create a likelihood of confusion.  *See*, *e.g., Sally Beauty Co.*, 304 F.3d at 973; *Paddington*, 996 F.2d at 587 ("[i]n determining a defendant's intent, 'actual or constructive knowledge' of the prior user's mark or dress may indicate bad faith").  "[A] finding of intent to copy and 'cash in' on the plaintiffs' reputation and goodwill may, standing alone, justify a finding of likelihood of confusion." *Hartford House Ltd. v. Hallmark Cards*, 647 F. Supp. 1533, 1543 (D. Colo. 1986) ("one who adopts a trade dress similar to another already established in the market place is viewed with suspicion by the courts") *aff'd*, 846 F.2d 1268 (1988).  *See also Clinique Labs., Inc. v. Dep Corp.*,  945 F. Supp. 547, 555 (S.D.N.Y. 1996) ("second comer has a duty to name and dress its product so as to avoid likelihood of confusion. . . .  [E]vidence of intentional copying raises a presumption that the second comer intended to create a confusing similarity").

There can be no question that Defendants intentionally copied John Allan's trade dress.

Defendants' argument that they copied Troy Mitchell's, and that Mr. Mitchell was given permission to copy John Allan's is not credible.  First, Mr. Mitchell paid to have his hair stylists trained at John Allan's in cutting techniques.  (Mitchell p. 49)  He asked John Allan's if they

would assist him in sourcing furniture and the design of his salon.  (Macary p. 489; Ex. 92).

John Allan's responded that it was "not looking to franchise or license the name" but added that

"in return for a licensing fee, we would provide consulting services that would cover every

aspect of the business from design and furnishings to membership building and stylists."

(Macary pp. 489-92; Ex. 93).  Troy Mitchell's did not enter into a license with John Allan's and

was not given permission to copy John Allan's trade dress.  (Macary pp. 492, 493)  Thus, Mr.

Mitchell did not have permission to copy John Allan's, leading to cease and desist letters.

Second, Defendants' knew Troy Mitchells did not have permission to copy -- no less to

give them permission.  Defendants Tatro and Leschuk are successful and sophisticated

businessmen.  They have filed for trademarks.  They even testified that they would not have used

the Craig Allen's logo had they known John Allan's was a registered trademark.  (Tatro p. 92;

Leschuk p. 215)  They insisted that a visitor interested in doing business with Craig Allen's sign

a non-disclosure agreement.  (Leschuk p. 210-11; Ex. 69)  They never saw an agreement

between Plaintiff and Troy Mitchell.  And despite speaking to every other establishment they

visited, they did not speak to John Allan or anyone there, nor did they ask permission to take

photographs at John Allan's (they did ask permission from Troy Mitchell's) (Tatro pp. 152, 153).

See discussions above in sections C-F:  Evidence of Actual Confusion, Similarity of

Products and Marketing, Degree of Care Exercised by Consumers and Strength of Mark.

**C.     Defendants are Not Absolved of Liability Because They Changed Their Logo**

That Defendants changed their logo and stopped using A RETURN TO A SIMPLER

TIME and MEN'S SERVICE REDISCOVERED does not render an injunction moot.

First, while Defendants have made certain changes, they are still using the infringing

Craig Allen's name and trade dress.  To avoid an injunction based upon the cessation of

25

infringement, the cessation must be "irrefutably demonstrated" and "total." *Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804, 809 (1st Cir. 1971).

  Even if Defendants had ceased all of their infringing activities, an injunction would still be proper given the extraordinary scope and extent of Defendants' prior and ongoing infringing conduct. *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1273 (D.D.C. 1997) ("Columbia Partners' present activities in advertising are acceptable. But this does not obviate plaintiffs' request for an injunction. The problem is that the court cannot have any confidence that Columbia Partners will maintain the status quo without injunctive relief. As plaintiffs have amply proven, it was virtually anything goes at Columbia Partners until plaintiffs complained, and even afterwards, up until and including the time of trial …."). *See also Fed. Trade Comm'n v. Affordable Media,* 179 F.3d 1228, 1237-38 (9th Cir. 1999) ("The standard for the voluntary cessation exception to mootness is whether the defendant is free to return to its illegal action at any time"); *Lindquist v. Idaho State Bd. of Corr.*, 776 F.2d 851, 854 (9th Cir. 1985) (A case may become moot as a result of voluntary cessation of wrongful conduct only if "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."); *Sanrio Co. Ltd. v. Ann Arctic Inc.*, 48 U.S.P.Q.2d 1429, 1435-36 (E.D.N.Y. 1998) (no mootness found even where Defendants "closed their business and no longer import or manufacture products. In these affidavits, however, defendants also assert that their businesses were forced to close because of the instant action. Presumably, then, were this action to be discontinued or injunctive relief denied, defendants could simply re-open their stores. . . . The instant request, then, is not moot"); *Frontier Corp. v. Telco Commc'ns Group, Inc.*, 965 F. Supp. 1200 (S.D. Ind. 1997) (injunctive relief granted even though violations ceased six months

ago, where the violation had not been a brief, aberrant episode; the defendant's actions were systematic and continued at least for nearly three months).

Absent entry of an injunction, Defendants would be free to resume their infringing conduct at any time with impunity.  And given Defendants' copying of third party articles after being sued by Plaintiff and failing to remove the plagiarized articles from their website after being asked to do so by the author, there is no reason to "trust" that Defendants will not resort to infringing activity.

Second, "[a] previous infringer of a mark has a greater duty to adopt a distinctive mark." *Universal Motor Oils Co., Inc. v. Amoco Oil Co.*, 743 F. Supp. 1484, 1488 (D. Kan. 1990) ("*Universal Motor II*") (citing *Cyclonaire Corp. v. U. S. Sys., Inc.*, 209 U.S.P.Q. 310, 315 (D. Kan. 1980).  "An infringer is required to keep a safe distance away from the margin line, even if that requirement is a handicap."  *Universal Motor II*, 743 F. Supp at 1488-89 (citing *Indep. Nail & Packing Co. v. Stronghold Screw Prods.*, 215 F.2d 434, 436 (7th Cir. 1954)).  The infringer "must do more than see how close [it] can come with safety to that which [it was] enjoined from doing." *Eskay Drugs v. Smith, Kline & French Labs.*, 188 F.2d 430, 432 (5th Cir. 1951);  *see also AMF Inc. v. Int'l Fiberglass Co.*, 469 F.2d 1063, 1065 (1st Cir. 1972); *Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 639 (9th Cir. 1963) (quoting *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir. 1930)).

The district court has substantial discretion to decide how close is "too close."  *Serv. Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1124 (7th Cir. 1988); *Cf. Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1432 (7th Cir. 1985) ("The court may require the contemnor to choose a distinctively different mark rather than to hew so close to the line that the parties must interminably return to court to haggle about every mark").  *See also E. & J. Gallo Winery v.*

*Consorzio del Gallo Nero*, 782 F. Supp. 457, 468 (N.D. Cal. 1991) (recognizing that trademark plaintiff is "entitled to relief, is entitled to effective relief," and that "[i]f the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [plaintiff] substantial protection of its trademark.") (quoting *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986)).

**D.     Damages and Attorneys' Fees**

"Trademark infringement and unfair competition by their very nature result in irreparable injury since the attendant loss of goodwill, reputation and business cannot adequately be quantified and the trademark owner cannot adequately be compensated."  *Bayer Healthcare LLC v. Nagrom Inc.*, 72 U.S.P.Q.2d 1751, 1756 (D. Kan. 2004).  *See also Heartland Corp. v. Sifers*, No. 02-CV-2136, 2002 U.S. Dist. LEXIS 13581, at *28 (D. Kan. July 12, 2002) ("Because a trademark represents intangible assets, such as reputation and goodwill, irreparable injury will be presumed upon a showing of trade mark infringement").

In an "exceptional case" involving deliberate and willful infringement, the plaintiff is entitled to an award of its reasonable attorneys' fees and costs.  15 U.S.C. § 1117(a).  *See W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1273 (10th Cir. 2005).  This circuit has affirmed awards of attorneys fees where, as here, defendant continued infringement after receiving a cease and desist letter.  *United Phosphorus Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219 (10th Cir. 2000); *Bishop v. Equinox Int'l* Corp., 154 F.3d 1220 (10th Cir. 1998) *aff'd*, 256 F.3d 1050 (2001); *Takecare Corp. v. Takecare of Oklahoma, Inc.,* 889 F.2d 955 (10th Cir. 1989).

Here, the wanton appropriation of the entirety of John Allan's business, combined with continued infringement after being caught and sent two cease and desist letters, warrant the imposition of costs and attorney fees on Defendants.  In short, had Defendants ceased its

infringing activities when caught, Plaintiff would not have been forced to expend such time and expenses protecting its rights.

## IV.    RELIEF REQUESTED

Plaintiff respectfully submits that the following injunctive relief is appropriate, would not be prohibitively expensive, and would permit Defendants to remain in business: (Meing 474-79).

A.    An injunction prohibiting Defendants from using the Craig Allen's name or any other name that contains the name Allen's or that is confusingly similar to John Allan's;

B.    An injunction prohibiting Defendants from using the Craig Allen's circular logo or other logo that is confusingly similar to the John Allan's logo;

C.    An injunction prohibiting Defendants from using any other registered or common law trademarks of Plaintiff or any confusingly similar marks; and

D.    An injunction prohibiting Defendants from using the John Allan's trade dress. This can be effectuated by mandating that Defendants:

i.    remove the adhesive on the glass that gives it a frosted look;

ii.    change the color of their cutting jackets and smocks;

iii.    replace their low-cut club chairs in which patrons sit while receiving service with traditional hair cutting chairs;

iv.    remove their center cutting stations; and

v.    remove their pool table.

Plaintiff respectfully requests that the Court enter judgment in its favor and against

Defendants for such injunctive relief, together with an award of attorneys fees, the recovery of

costs, and such further relief as the Court deems just and equitable.


Dated: March 30, 2007

|  |  |
|---|---|
| By: | s/Charles E. Millsap |
|  | Charles E. Millsap (# 9692) |
|  | FLEESON, GOOING, COULSON & KITCH, LLC |
|  | 125 N. Market Street, Suite 1600 |
|  | Wichita, Kansas 67201-0997 |
|  | Tel:  (316) 267-7361 |
|  | Fax: (316) 267-1754 |
|  | E-mail: cmillsap@fleeson.com |

and

|  |  |
|---|---|
| By: | s/Kenneth L. Bressler |
|  | Kenneth L. Bressler |
|  | BLANK ROME LLP |
|  | The Chrysler Building |
|  | 405 Lexington Avenue |
|  | New York, New York 10174 |
|  | Tel: (212) 885-5000 |
|  | Fax: (212) 885-5001 |
|  | E-mail: kbressler@blankrome.com |

Counsel for Plaintiff

<u>Certificate of Service</u>

I hereby certify that on March 30, 2007March 30, 2007, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

> James M. Armstrong
> FOULSTON SIEFKIN LLP
> 1551 N. Waterfront Parkway
> Suite 100
> Wichita, Kansas 67206-9776
>
> Todd N. Tedesco
> FOULSTON & SIEFKIN LLP
> 1551 N. Waterfront Parkway
> Suite 100
> Wichita, Kansas 67206-4466
>
> <u>Counsel for Defendants</u>

Plaintiff also delivered to the chambers of the Court a paper copy of this brief in accordance with the Court's Standing Order Pertaining to CM/ECF.

By:    <u>s/ Charles E. Millsap</u>