### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| THE JOHN ALLAN COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | No.  05-1150-MLB |
| | ) | |
| THE CRAIG ALLEN COMPANY L.L.C, | ) | |
| CRAIG ALLEN TATRO, and ERIK DAVID | ) | |
| LESCHUK, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM DECISION

**TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . 3

II.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . 4
      A.   The Salons. . . . . . . . . . . . . . . . . . .4
      B.   Confusion by Customers. . . . . . . . . . . . .8

III.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . 10
      A.   Registered Trademark Infringement . . . . . . 10
           1.   JOHN ALLAN'S & JA Circle Design . . . . . 11
                a.   Degree of Similarity. . . . . . . . .11
                b.   Intent of Alleged Infringer. . . . . 13
                c.   Consumer Confusion. . . . . . . . . .14
                d.   Similarity of Services and Manner of
                     Marketing. . . . . . . . . . . . . . 16
                e.   Degree of Care. . . . . . . . . . . . 17
                f.   Strength or Weakness of Mark. . . . . 18
                g.   Conclusion. . . . . . . . . . . . . .18
           2.   MEN'S SERVICE REDISCOVERED and A RETURN TO A
                SIMPLER TIME. . . . . . . . . . . . . . . 18
                a.   Degree of Similarity. . . . . . . . . 18
                b.   Intent of Alleged Infringer. . . . . 19
                c.   Consumer Confusion . . . . . . . . . 20
                d.   Similarity of Services and Manner of
                     Marketing. . . . . . . . . . . . . . 20
                e.   Degree of Care. . . . . . . . . . . .20
                f.   Strength or Weakness of Mark. . . . .20
                g.   Conclusion. . . . . . . . . . . . . .22
      B.   Unregistered Trademark Infringement. . . . . .22
           1.   John Allan's. . . . . . . . . . . . . . . 23
                a.   Protectable Mark. . . . . . . . . . . 23
                b.   Likelihood of Confusion. . . . . . . 25
                     1.   Degree of Similarity. . . . . . 25
                     2.   Intent of Alleged Infringer. . . 26
                     3.   Consumer Confusion. . . . . . . 26
                     4.   Similarity of Services and Manner of
                          Marketing. . . . . . . . . . . . 27
                     5.   Degree of Care. . . . . . . . . 27
                     6.   Strength or Weakness of Mark. . . 27
                c.   Conclusion. . . . . . . . . . . . . . 28
           2.   JA Circle Design. . . . . . . . . . . . . 29
                a.   Protectable Mark. . . . . . . . . . . 29
                b.   Likelihood of Confusion. . . . . . . 30
                c.   Conclusion. . . . . . . . . . . . . .30
      C.   Trade Dress Infringement. . . . . . . . . . . 30

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . .39

V.    RELIEF. . . . . . . . . . . . . . . . . . . . . .39

## I.  INTRODUCTION

This is a trademark and trade dress infringement case arising under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).  Plaintiff The John Allan Company claims that defendant The Craig Allen Company, and its owners, who operate a men's salon in Wichita, Kansas, have infringed on its federally registered trademarks and unregistered trademarks and trade dress.

The John Allen Company is the owner of four federally registered service marks.[1]  In 1996, plaintiff registered the mark JOHN ALLAN'S & JA Circle Design for "men's and women's haircutting services, namely haircutting, manicures, facials, and massage services; retail counter in the field of hair and skin products."  In June 2004, plaintiff registered the mark, A RETURN TO A SIMPLER TIME, for "beauty salons and spa services."  In December 2004, plaintiff registered the mark, MEN'S SERVICE REDISCOVERED, for "beauty salons and health spa services."  On August 30, 2005, plaintiff registered the mark JA JOHN ALLAN'S for "hair care products."[2]

In the pretrial order, plaintiff sought injunctive relief for defendants' use of (1) the name Craig Allen's, including the name The Craig Allen Company, LLC; (2) the CA circle design logo; (3) the mark Craig Allen's and CA circle design; (4) John Allan's registered marks; and (5) John Allan's unregistered trade dress of its Downtown and Midtown New York club locations.  Plaintiff describes its trade dress

---

[1] Service marks are registrable in the same manner and have the same effect as trademarks.  15 U.S.C. § 1053.

[2] Plaintiff does not assert that defendants have infringed on the 2005 mark.  Defendants do not sell John Allan's products in their salon, nor do they market products under the Craig Allen name.

as the "look and feel of an old world men's club" and asserts that the elements that comprise its trade dress consist of some or all of the following: interior and exterior frosted glass with logo; club styled leather chairs for haircuts; black cutting jackets; center cutting stations; wood dressers at stations; stools for cutting; manicure during haircut; low table for drinks; old barber chairs; pool table; bar and lounge; cigar room; shoe shine stand, and oriental style rugs. (Exh. 174).  Plaintiff also seeks its costs and an award of attorney's fees.

The case was tried to the court.  This decision represents the findings of fact and conclusions of law resulting therefrom.  Fed. R. Civ. P. 52(a).

## II.   FINDINGS OF FACT[3]

A.   The Salons

In 1988, John Allan Meing opened a men's salon near Wall Street in New York City.  Meing intended to create a club-like environment that would provide salon services for men.  The salon was named John Allan's.  John Allan's has now grown to two club locations in New York City, the Downtown and Midtown Clubs, and two additional non-clubs, one within Sak's department store, and the other in Tribeca.  At present, there are no clubs or facilities outside New York City, but John Allan's grooming products are marketed nationwide.  John Allan's has a membership program where patrons pay annual dues entitling them to basic services all year long at any of the four John Allan's

_____

[3] The facts set forth in this section consist of a general overview of the facts of this case.  Additional facts will be discussed, where appropriate, throughout the decision.

locations.  At the time of trial, Meing estimated that John Allan's has 3500 members.  (Tr. Tran. at 282-85).

John Allan's club locations are similar, but not identical, in "look and feel."  (Counsel and witnesses often used the words "look and feel" to describe and contrast the appearance of the salons.)  The club locations have frosted glass on the outside windows, with slogans on the glass and images of patrons receiving services.  Both locations have leather chairs for patrons to sit in while the stylists cut their hair, but the chairs differ in color and style.  Both locations use double sided cutting stations, where patrons face each other while having their hair cut.  The Midtown location's cutting stations are black while the Downtown's stations are a dark wood.  The Midtown location has exposed ducts in the ceiling and the floor is cement while the Downtown location has wood floors and a finished ceiling.  Both locations have antique barber chairs where patrons sit while receiving a hot towel treatment and a shoe shine.  Both locations issue patrons a black smoking jacket bearing the JA circle logo to wear while receiving services.  The employees who perform the shoe shine services wear black smocks with the JA circular logo.  Both locations have  a pool table, bar, and, until recently, a cigar room.[4]  (Tr. Trans. 289-96; exh. 54).

John Allan's Sak's location does not have the same look and feel as the Midtown and Downtown clubs.  It is a much smaller space and does not have a pool table, cigar room or the center cutting stations.

---

[4] New York City has banned the smoking of cigars in any establishment.  John Allan's currently has a "cigar" room but the patrons cannot smoke cigars on the premises.

(Tr. Trans. at 300-02).

John Allan's Tribeca location likewise does not have the same look and feel as the Downtown and Midtown clubs.  The location does have the cutting jackets, low cut chairs, antique barber chairs, a pool table and bar. It does not have frosted glass on the windows. Unlike any of the other locations, it has a training area used to train stylists in John Allan cutting techniques and a media room to showcase John Allan's line of grooming products.  (Tr. Trans. at 306-12).

During the years 2003 and 2004, defendants Tatro and Leshcuk visited a variety of men's salons while researching ideas for a men's salon in Wichita, Kansas.  Tatro and Leschuck visited Troy Mitchell's in Tulsa five or six times, John Allan's Midtown and Downtown clubs, and various other unisex salons.  During their visits, they took photographs of Troy Mitchell's and John Allan's clubs.[5]

While visiting the John Allan's clubs in New York, Tatro and Leschuck did not discuss the idea of their new business with anyone employed by John Allan's, including Meing, who was present.  They collected brochures, business cards and gift bags that displayed the JA circular logo.  Tatro and Leschuck decided to use the name Craig

---

[5] Troy Mitchell, the owner of the salon Troy Mitchell's, was willing to assist them in opening a salon.  (Tr. Trans. at 73-79). Troy Mitchell's had a logo with the T and M in a circle and the name TROY MITCHELL'S under the circular design.  The salon had a small bar with tap beer and a cigar room along with low cut leather chairs for the patrons and stools for the stylists.  There was also a side table next to the chairs for beverages.  Patrons could sit in antique barber chairs to receive a shoe shine.  The individual giving the shoe shine wore a black smock.  Patrons could also enjoy a game of pool in Troy Mitchell's.  (Tr. Trans. at 79-85; Ex. 404-A).
At the time of trial, Troy Mitchell's was no longer in business.

Allen's for their own salon after learning about John Allan's.  (Tr. Trans. at 26-41).

Tatro and Leschuck employed Jeremy Luginbill to design a website and logo for Craig Allen's.  They gave Luginbill the website addresses and print materials for both John Allan's and Troy Mitchell's. Luginbill attempted to create a logo for Craig Allen's that was different from John Allan's and Troy Mitchell's but Tatro did not want Luginbill to deviate from the JA circular design.  Luginbill was uncomfortable with designing a similar logo and approached Tatro and Leschuck about his concerns.  Tatro gave the overall impression that they were working together with both John Allan's and Troy Mitchell's. Luginbill was further informed that Troy Mitchell gave Tatro and Leschuck materials and told them to use whatever they wanted.

Luginbill created a logo that had a C and A in a circle above the name Craig Allen's. (Tr. Trans. at 160-79, 193; exh. 46).

     

When Craig Allen's opened for business, the salon shared many features of John Allan's New York Downtown and Midtown clubs.  For example, the outside windows had frosted glass with the CA circular logo and the phrase, "A RETURN TO A SIMPLER TIME," the same phrase which appeared on the frosted windows of John Allan's clubs, together with the circular John Allan logo.  Like John Allan's, the

-7-

receptionist at Craig Allen's took the patrons' jackets and gave them a black smoking jacket to wear. Craig Allen's had, and has, low cut leather chairs for patrons, double sided cutting stations, stools for the stylists, side tables for beverages and manicures, retro styled barber chairs for hot towel treatments, a small bar and a pool table. (Tr. Trans. 47-55, 61, 135-40; exh. 53).

In the Spring of 2005, attorneys representing plaintiff and defendants exchanged letters regarding defendants' alleged misuse of John Allan's trademarks and trade dress. Although defendants initially denied any misuse, Tatro and Leschuck ultimately removed the CA circular logo from everything in Craig Allen's as well as the protected slogans from the frosted windows. After removing the circular logo, defendants created a new logo, a laurel leaf in a circle that surrounds the C and A. (Tr. Trans. at 93-95; exh. 34).



However, the interior layout and furnishings of Craig Allen's were not changed.

B.  Confusion by Consumers

In April 2004, Steve Alvarez, a resident of Wichita, stopped at one of John Allan's clubs in New York for a hair cut and manicure. After returning to Wichita, Alvarez went to a shop to pick up a framed picture where he noticed a big cardboard sign with a round logo on it. Alvarez thought he recognized the logo as that of John Allan's.

Alvarez asked the frame shop proprietor if the men's salon from New York was coming to Wichita and was told that the businessmen who owned the salon were upstairs and Alvarez could go speak to them. Alvarez asked Tatro and Leschuck if their business was a franchise of John Allan's. After some embarrassing silence, they stated that their business was Craig Allen's and was not a franchise. (Steve Alvarez Depo. at 13-31).

In February 2005, Michelle Wheeler contacted a representative of John Allan's to inquire about purchasing products after seeing an advertisement for John Allan's products in a magazine. Wheeler, an owner of a day spa, was familiar with Craig Allen's in Wichita. After reviewing the product information and logos, Wheeler asked the John Allan's representative if the salon was affiliated with Craig Allen's. Wheeler was informed that the two were not related. After the conversation, Wheeler visited both Craig Allen's and John Allan's websites. Wheeler thought the two sites and the service packages were very similar. (Tr. Tran. at 246-53; Brian Riordan Depo. at 4-5).

In early 2006, Chad Green visited Craig Allen's for services. Green then returned to New York. In March, Green walked by John Allan's club in Midtown. Green thought that the two salons were somehow affiliated due to similar names and logos. Green entered John Allan's to get a hair cut. Green thought the interior of John Allan's was very similar to Craig Allen's. Green asked his stylist if both salons were owned by the same person. The stylist stated that they were not. Green testified that both salons are very distinctive in that they offer salon services with a bar, pool table and low leather chairs. (Chad Green Depo. at 4-29).

In April 2006, Charles Chimera, a resident of New York and member of John Allan's, visited a friend in Wichita.  Chimera's friend took him to Craig Allen's for services.  Upon arriving at Craig Allen's, Chimera immediately noticed that the two salons were very similar. Chimera thought that Craig Allen's was practically identical to John Allan's in Midtown.  The only difference in the two locations was that Craig Allen's did not have a full bar.  (Charles Chimera Depo. at 4-10).

**III. CONCLUSIONS OF LAW**

A. Registered Trademark infringement[6]

In Counts 1 through 6, plaintiff has alleged that defendants have infringed on the use of its federally registered mark JOHN ALLAN'S & JA Circle Design and its service marks MEN'S SERVICE REDISCOVERED and A RETURN TO A SIMPLER TIME in violation of the Lanham Act.

The Lanham Act prohibits the unauthorized use of a counterfeit or imitation of a registered mark in a manner likely to cause confusion in the marketplace concerning the source of services.  In order to prevail on its claims of trademark infringement, plaintiff

---

[6] In post-trial briefing, defendants do not spend a lot of effort analyzing plaintiff's claims in counts 1 through 6, with the exception of the mark John Allan's.  Defendants assert that these claims are moot since defendants stopped the use of the marks at the time the complaint was filed.  The Tenth Circuit, however, has held that the trial court has discretion to grant or deny an injunction against a defendant even if that defendant has ceased using the plaintiff's protected marks.  Brunswick Corp. v. Spirit Reel Co., 832 F.2d 513, 525 (10th Cir. 1987).

Accordingly, the court will evaluate each of plaintiff's claims on the merits.

must establish that a likelihood of confusion exists.[7] <u>Sally Beauty Co., Inc. v. Beautyco, Inc.</u>, 304 F.3d 964, 972 (10th Cir. 2002); <u>see also</u> <u>GTE Corp. v. Williams</u>, 904 F.2d 536, 539 (10th Cir. 1990)("The likelihood of confusion test also governs [plaintiff's] false designation of origin claim under section 43(a).") A plaintiff must prove likelihood of confusion even if the mark is registered.

The court must consider the following nonexhaustive factors: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." <u>Id.</u> "All relevant factors must be weighed to determine the likelihood of confusion. <u>Heartsprings, Inc. v. Heartspring, Inc.</u>, 143 F.3d 550, 558 (10th Cir. 1998).

**1.   JOHN ALLAN'S & JA Circle Design**

Plaintiff asserts that defendants have infringed on its federally protected John Allan's and JA circle design logo.[8]

**a.  Degree of Similarity**

---

[7] Although this case involves service marks, the elements of trademark or service mark infringement are identical. <u>C.f.</u> <u>Donchez v. Coors Brewing Co.</u>, 392 F.3d 1211, 1219 (10th Cir. 2004). Accordingly, the court will utilize cases involving both services and products in its analysis.

[8] Plaintiff's claims are against the use of defendants' initial logo and not the logo that defendants are currently using for Craig Allen's.




The degree of similarity between marks is tested on three levels: sight, sound, and meaning.  <u>King of the Mountain Sports, Inc. v. Chrysler Corp.</u>, 185 F.3d 1084, 1090 (10th Cir. 1999).  The marks must be examined "in the context of the marks as a whole as they are encountered by consumers in the marketplace." <u>Id.</u> (citing <u>Beer Nuts, Inc. v. Clover Club Foods Co.</u>, 805 F.2d 920, 925 (10th Cir. 1986)("<u>Beer Nuts II</u>").

> In evaluating similarity, "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." <u>Levi Strauss & Co. v. Blue Bell, Inc.</u>, 632 F.2d 817, 822 (9th Cir. 1980); <u>American Home Products Corp. v. Johnson Chemical Co.</u>, 589 F.2d 103, 107 (2d Cir. 1978); <u>James Burrough Ltd. v. Sign of Beefeater, Inc.</u>, 540 F.2d 266, 275 (7th Cir. 1976); <u>Fotomat Corp.</u>, 437 F. Supp. at 1244. The marks "must be compared in the light of what occurs in the marketplace, not in the courtroom." <u>James Burrough Ltd.</u>, 540 F.2d at 275. "A prospective purchaser does not ordinarily carry a sample or specimen of the article he knows well enough to call by its trade name, he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired." <u>Avrick v. Rockmont Envelope Co.</u>, 155 F.2d 568, 573 (10th Cir. 1946). Therefore, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented. <u>Id.</u> at 572-73; <u>American Home Products</u>, 589 F.2d at 107; <u>James Burrough Ltd.</u>, 540 F.2d at 275; <u>Union Carbide</u>, 531 F.2d at 382.

<u>Beer Nuts, Inc. v. Clover Club Foods Co.</u>, 711 F.2d 934, 941 (10th Cir. 1983)("Beer Nuts I").

Upon sight, the line symmetry in both logos is almost identical. (Exhs. 50, 51).  The testimony of Alvarez showed that a customer

-12-

desiring services could be confused about the source of the services based on the logos, at least initially.

In this case, both names are the proper names of the founding owners.  While the name Allan sounds identical in pronunciation to Allen, the first names do not sound similar.  There was no evidence, however, of confusion based solely on the names Allen and Allan.

The meaning of both marks is the proper names of the mark's owners.  Testimony established that both marks are the middle names of Meing and Tatro and they do not have any other meaning.  See Beer Nuts I, 711 F.2d at 926 (evidence at trial that the mark "brew" means beer).  Since both marks can only be interpreted to mean a proper name of an individual, they convey a similar meaning or idea.  See id.

Thus, the court finds that the two marks, when presented singly, are somewhat similar in terms of their overall sight, sound, and meaning as they are encountered by consumers in the marketplace.

This factor weighs slightly in favor of plaintiff.

### b.   Intent of Alleged Infringer

The evidence produced at trial was that defendants had knowledge of plaintiff's mark and directed their designer to essentially copy the mark, but without any investigation as to the mark's registered status.  "Although the 'deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion,' Beer Nuts II, 805 F.2d at 927, 'mere knowledge [of a similar mark] should not foreclose further inquiry,' GTE Corp., 904 F.2d at 541. 'The proper focus [remains] whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff.'"  Universal Money

-13-

Centers, Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1532 (10th Cir. 1994).

The Tenth Circuit in Universal determined that defendant "undoubtedly knew about [plaintiff's] registered marks." Nevertheless, that knowledge was not enough to support a finding that defendant adopted its mark with the intent to derive the plaintiff's goodwill given the fact that the defendant was relying on its own publicity and reputation to attract customers. Id.

Defendants knew that John Allan's was successful in New York and there is circumstantial evidence that defendants purposefully used the mark Craig Allen's to take advantage of plaintiff's goodwill for a salon in Wichita, Kansas. There was repeated testimony that Tatro wanted to "emulate" John Allan's logo. Luginbill was given numerous items with the logo and told "not to reinvent the wheel." Tatro also testified that the similarity of the logos was no coincidence.

Thus, defendants purposefully and knowingly used plaintiff's mark to create a mark for their salon. While the parties operate businesses thousands of miles apart, defendants' behavior supports a conclusion that the mark was copied with an intent to derive at least some benefit from plaintiff's reputation and goodwill. See Beer Nuts II, 805 F.2d at 927.

This factor weighs in favor of plaintiff.

c.   Consumer Confusion

This factor can be supported by evidence of actual confusion among consumers within the marketplace. Heartsprings, Inc., 143 F.3d at 557. In Amoco Oil Co. v. Rainbow Snow, 748 F.2d 556 (10th Cir. 1984), the Tenth Circuit explained

-14-

In order to be confused, a consumer need not believe
that the owner of the mark actually produced the item and
placed it on the market. The public's belief that the
mark's owner sponsored or otherwise approved the use of the
trademark satisfies the confusion requirement.

Similarly, the Seventh Circuit has said:

What is infringed is the right of the public
to be free of confusion and the synonymous right
of a trademark owner to control his product's
reputation. Thus Distiller's evidence must be
evaluated on the basis of whether it disclosed a
likelihood that consumers generally familiar with
Distiller's mark would be likely, upon seeing
only Restaurant's sign, to believe that
Restaurant's enterprise was in some way related
to, or connected or affiliated with, or sponsored
by, Distiller. If so, a right to relief for
trademark infringement has been shown.

Id. at 558-59(citing John Burrough Ltd. v. Sign of the Beefeater,
Inc., 540 F.2d 266, 274 (7th Cir. 1976).

Plaintiff produced testimony from four consumers.

Alvarez testified that seeing the logo gave him the impression
it was the same business.

Alvarez: That's another interesting.  My -- my brain
recognizes patterns.  And the unique thing about the logo
is that it's a continuous line that creates the logo, okay?
So, after a two-month period, I'd forgotten the name of the
company [John Allan's].

Question: In New York?

Alvarez: In New York.  I knew it was something Allan,
but I knew it had a really cool logo because I'm a math
teacher.  I recognize geometrical patterns.  When I saw the
logo, my brain saw a continuous logo with Allen's and I
thought it was the same company from New York.

(Alvarez Depo. at 25).

Wheeler, an owner of a salon in Wichita, testified as follows:

Question: On this magazine ad or page that you saw,
what all were you able to observe or learn about the John
Allan Company?

-15-

> Wheeler: It was just a snapshot of some products. The logos looked identical. I just wanted to know if you could get them here locally, so it was more about the products. So I picked up the phone and called the number.
>
> Question: Now, you said when I was asking you about the magazine article that the logos looked identical. Which logos are you referring to?
>
> Wheeler: We had -- I had only been familiar with the Craig Allen's logo so that was the first time I had seen a John Allan's, per se.

(Wheeler Depo. at 9-10).

On the other hand, Green testified that he knew the salons had a different name when he entered the John Allan's club at Midtown, despite the similarities of the logos. After he entered and looked around he began to wonder if the owners were somehow related and then questioned his stylist. Chimera knew that the two salons were not the same company and was not confused but merely testified as to how similar they looked.

Based on the trial testimony, not one witness testified that they were confused as to the affiliation of the salons based on the name alone. Chimera's testimony does not support a finding of actual confusion because he was not confused and knew that the companies were not related. Both Wheeler and Alvarez testified that they were initially confused based on the similarities of the original Craig Allen's logo. While Alvarez did recall that the name of John Allan's was something Allan, he repeatedly testified that it was the design of the logo that made him think it was the same company.

The court finds that this factor weighs in favor of plaintiff, albeit very minimally.

### d. Similarity of Services and Manner of Marketing

-16-

"The greater the similarity between the products and services, the greater the likelihood of confusion." <u>Universal</u>, 22 F.3d at 1532. In this case, there is no dispute that the services provided by both companies are virtually identical. Both companies offer typical salon services, such as haircuts and manicures. To the extent the services differ, the differences are minimal.

In considering the marketing techniques, "[t]he possibility of confusion is greatest when products reach the public by the same retail outlets." <u>Beer Nuts I</u>, 711 F.2d at 941. John Allan's advertises its services in New York City and appears to be well known in that market. John Allan's markets its products nationwide. Craig Allen's does not market its salon services nationwide, but rather only the far smaller Wichita area. Craig Allen's has no products bearing the Craig Allen name or logo.

While the similarity of services weighs in favor of plaintiff, the marketing techniques for those services weighs in favor of defendants. Accordingly, this factor is neutral.

        e.   Degree of Care

"A consumer exercising a high degree of care in selecting a product <u>reduces</u> the likelihood of confusing similar trade names." <u>King of the Mountain Sports, Inc.</u>, 185 F.3d at 1092 (emphasis supplied). Inexpensive products increase the likelihood of confusion in consumers since consumers are more likely to choose expensive items carefully and buy inexpensive items on an impulse. <u>Beer Nuts I</u>, 711 F.2d at 941. Both John Allan's and Craig Allen's primarily cater to professionals and are not similar in design or service to barbershops or unisex salons. Both locations offer membership packages ($900 at

-17-

Craig Allen's) and expensive products ($650-$700 for shaving kits at
John Allan's).  While there are services that one can receive a la
carte, i.e. $30 haircut at Craig Allen's, the expense of the services
is higher than that of a barbershop.

In this case, the court finds that the types of consumers who
frequent men's salons, such as that of plaintiff's and defendants',
exercise a somewhat high degree of care in selecting a salon for
services.  Accordingly, this factor is neutral.

### f.   Strength or Weakness of Mark

Plaintiff registered its mark in 1994.  A trademark reaches
incontestable status after continuous use for five years.  15 U.S.C.
§ 1065.  Incontestable marks are conclusively presumed to be
nondescriptive.  Beer Nuts I, 711 F.2d at 940.  The mark also has
great commercial strength as plaintiff's products are marketed
nationwide displaying the JA circle logo.

The court finds that this factor weighs heavily in favor of
plaintiff.

### g.   Conclusion

After reviewing all of the applicable factors, the court finds
that a likelihood of confusion did exist between the John Allan's &
JA circle logo and defendants' initial Craig Allen's & CA logo.

Accordingly, the court finds that defendants infringed on
plaintiff's registered mark John Allan's & JA circle logo.

**2.   MEN'S SERVICE REDISCOVERED and A RETURN TO A SIMPLER TIME**

The mark "A RETURN TO A SIMPLER TIME" was registered in June 2004
and "MEN'S SERVICE REDISCOVERED" was registered in December 2004 .

### a.  Degree of Similarity

-18-

Defendants used plaintiff's marks verbatim. John Allan's Midtown location had and has both marks etched in the frosted glass in all capital letters. (Exhs. 495-1 and 495-10). John Allan's also used and uses those marks on its website. From the time defendants opened Craig Allen's in late 2004 and until sometime in June 2005, Craig Allen's had the phrase "A RETURN TO A SIMPLER TIME" etched on the frosted glass at its location. Tatro used the phrase "MEN'S SERVICE REDISCOVERED" during an interview with the Wichita Business Journal in May 2004.

Both parties testified that the marks meant that men receive services in a club atmosphere that is significantly different than that of unisex or barbershop services. While the court questions whether the meaning of the marks, standing alone, would be clear to the average consumer, based on the testimony at trial the court finds that defendants intended to convey the identical meaning that plaintiff intended to convey.

The court finds that this factor heavily weighs in favor of plaintiff for the mark "A RETURN TO A SIMPLER TIME." However, the court also finds that the single use of "MEN'S SERVICE REDISCOVERED" during an interview only weighs slightly in favor of plaintiff. That mark was not used on defendants' website or on the frosted glass at the salon at the time of the interview.

### b.   Intent of Alleged Infringer

Tatro testified that he copied the phrases from either John Allan's or Troy Mitchell's. At the time Troy Mitchell's was open, the salon was using the same slogans. Both Tatro and Troy Mitchell testified that Mitchell gave Tatro permission to use whatever

-19-

materials he desired for Craig Allen's.  No such permission was given by Meing to defendants.

Defendants purposefully and knowingly used plaintiff's mark to create a mark for their company.  This action constitutes an inference that defendants intended to copy the mark in order to derive a benefit from plaintiff's goodwill.  See Beer Nuts II, 805 F.2d at 927.

This factor weighs in favor of plaintiff.

### c.   Consumer Confusion

There was no evidence that any consumer was confused by defendants' use of these trademarks.

This factor weighs in favor of defendants.

### d.   Similarity of Products and Manner of Marketing

Again, as discussed supra at 16, the similarity of services weighs in favor of plaintiff and the manner of marketing those services weighs in favor of defendants.  This factor is neutral.

### e.   Degree of Care

The court finds that the types of consumers who frequent men's salons like those of plaintiff and defendants exercise a high degree of care in selecting a salon for services.

This factor is neutral.

### f.   Strength or Weakness of Mark

Both of the marks are registered which gives the inference that the mark was not "merely descriptive."  See GTE Corp. v. Williams, 904 F.2d 536, 538 (10th Cir. 1990); see also 15 U.S.C. § 1052.  The court must make a factual determination, however, as to whether the marks fall within the descriptive or suggestive category.  "A mark is descriptive if it describes the product's [or service's] features,

qualities, or ingredients in ordinary language or describes the use
to which the product [or service] is put. A mark is suggestive if it
merely suggests the features of the product [or service], requiring
the purchaser to use imagination, thought, and perception to reach a
conclusion as to the nature of the goods [or services]." Donchez, 392
F.3d at 1216.

> The suggestive class was judicially developed to fill
> the need for protection of marks that were neither exactly
> descriptive nor fanciful. The distinction between
> descriptive and suggestive marks is difficult. The
> determination is often based on intuitive reactions rather
> than analytical reasoning. A distinguishing test,
> originally used in General Shoe Corporation v. Rosen, 4
> Cir., 111 F.2d 95, 98, has found increasing support in the
> courts. The distinction is that suggestive terms are those
> which require the buyer to use thought, imagination, or
> perception to connect the mark with the goods. Descriptive
> terms are those which directly convey to the buyer the
> ingredients, qualities, or characteristics of the product.
> The determination of whether a mark is descriptive
> requires consideration of the meaning of the term or mark
> to the prospective purchasers and not to the public in
> general.
> ***
> To determine whether a mark is descriptive or
> suggestive, courts and commentators have considered whether
> a competitor would need to use the term in describing his
> product to purchasers.

Educ. Dev. Corp. v. Econ. Co., 562 F.2d 26, 29 (10th Cir. 1977).

Both of the marks require the consumer to use thought,
imagination, or perception to connect the marks with the services that
plaintiff provides. The mark "A RETURN TO A SIMPLER TIME" could be
used to suggest a variety of products or services and does not
directly point to plaintiff's services. The mark "MEN'S SERVICE
REDISCOVERED" also requires thought to connect the mark to plaintiff's
business. There was no evidence regarding either marks effect on a
consumer's thought process. In reality, neither mark would mean much

to a prospective patron who had no idea about the services or products being offered.   However, the meaning of the marks would tend to increase based on a prospective patron's knowledge of the services offered; e.g. a patron who enters the salon for just a haircut will discover other services such as a shoe shine which may evoke the patron's imagination of "A RETURN TO A SIMPLER TIME."

The court finds that both marks are suggestive marks and require a high degree of protection.   Accordingly, this factor weighs in favor of plaintiff.

### g.   Conclusion

After reviewing all of the applicable factors, the court finds that a likelihood of confusion did exist in defendants' use of the mark "A RETURN TO A SIMPLER TIME."   The court, however, does not find that a likelihood of confusion existed because of defendant Tatro's one time use of the mark "MEN'S SERVICE REDISCOVERED" during an interview.   While Tatro clearly used plaintiff's mark, it was used during a brief interview with the Wichita Business Journal.   The court finds that it is highly unlikely that Tatro's single use, in 2004, lead to consumer confusion.

In conclusion, while it is a close call, the court finds that defendants infringed on plaintiff's mark "A RETURN TO A SIMPLER TIME," but did not infringe on plaintiff's mark "MEN'S SERVICE REDISCOVERED."

### B.   Unregistered Trademark Infringement

Plaintiff asserts that defendants have infringed on plaintiff's unregistered mark John Allan's, which includes the mark The John Allan Company and the domain name www.johnallans.com, and the JA circle design without the inclusion of the name John Allan's.   "Section 43(a)

-22-

of the Lanham Act, prohibiting the use of false designations of origin, protects against service mark infringement even if the mark has not been federally registered." <u>Donchez v. Coors Brewing Co.</u>, 392 F.3d 1211, 1215 (10th Cir. 2004). Under section 43(a), plaintiff must establish that (1) its mark is protectable, and (2) defendants' use of its mark is likely to cause confusion. <u>Id.</u> Claims pertaining to unregistered marks under section 43(a) are governed by the likelihood of confusion test applicable to registered marks. <u>GTE Corp. v. Williams</u>, 904 F.2d 536, 539 (10th Cir. 1990).

**1.   John Allan's**[9]

**a.   Protectable Mark**

Plaintiff asserts that defendants have infringed on its trade name John Allan's by naming their business Craig Allen's. Because plaintiff has never registered the service mark John Allan's with the United States Patent and Trademark Office (even though the John Allan's service mark that includes the circle logo has been registered), it is plaintiff's burden to demonstrate that John Allan's is protectable under § 43(a). <u>Donchez</u>, 392 F.3d 1211, 1217.

A service mark includes "any word ... or any combination thereof ... used by a person ... to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.

> The categories of trademarks in ascending order of relative strength are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. A generic mark

---

[9] This analysis applies equally to plaintiff's marks The John Allan Company, LLC and <u>www.johnallans.com</u> domain name.

refers to a general class of goods, such as "cola," of which an individual article is but a member. Such marks do not indicate the particular source of an item and are not entitled to any trademark protection. A descriptive mark identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients. A descriptive mark may receive protection only when it has acquired a secondary meaning by becoming distinctive of the applicant's goods in commerce. Suggestive marks suggest rather than describe a characteristic of the product and require the consumer to use imagination and perception to determine the product's nature. Arbitrary marks use common words, symbols, and pictures that do not suggest or describe any quality or characteristic of the goods or services. Finally, fanciful marks are words invented or selected for the sole purpose of functioning as a trademark. Suggestive, fanciful, and arbitrary marks are considered inherently distinctive and entitled to trademark protection.

<u>Sally Beauty Co.</u>, 304 F.3d at 975-76.

In this case, the mark is a name. Plaintiff must establish secondary meaning in order to be given protection under the Lanham Act. <u>Marker Intern. v. DeBruler</u>, 844 F.2d 763, 764 (10th Cir. 1988)(surname); <u>see also</u> <u>Susan's, Inc. v. Thomas</u>, 26 U.S.P.Q.2d 1804, 1993 WL 93333, *3 (D. Kan. Mar. 19, 1993)("Although personal names used as marks are not inherently distinctive, personal names can become protected marks under the Lanham Act if they are shown to have a secondary meaning.") "A mark has acquired secondary meaning if because of association with a particular product or firm over a period of time it has come to stand in the minds of the public as a name or identification for that product or firm." <u>Id.</u> "The ultimate inquiry is whether in the consumer's mind the mark denotes a single thing coming from a single source. That single source, however, need not be known by name by consumers." <u>Sally Beauty Co., Inc.</u>, 304 F.3d at 978.

To establish secondary meaning, a plaintiff can offer the following: "1) advertising expenditures; 2) consumer studies linking

the mark to a source; 3) sales success; 4) unsolicited media coverage
of the product; 5) attempts to plagiarize the mark; and 6) the length
and exclusivity of the mark's use." <u>Int'l Bancorp, LLC v. Societe des
Bains de Mer et du Cercle des Estrangers a Monaco</u>, 329 F.3d 359, 370
-71 (4th Cir. 2003).  Plaintiff did not offer any evidence on the
amount expended on advertising or consumer studies.

Plaintiff asserts that John Allan's has acquired secondary
meaning by its history of sales, media coverage, longevity of use and
intentional copying by defendants. (Doc. 98 at 18-19).  Plaintiff had
$3 million in sales in 2005.  Plaintiff markets products nationwide
in approximately 144 department stores and salons.  (Exh. 142).
Plaintiff also offered numerous examples of articles that appeared in
national publications. (Exhs. 1, 2, 3, 116, 155, 156).  Plaintiff was
featured on nationally televised programs.  (Exhs. 157, 158).
Plaintiff has exclusively used the name John Allan's since 1988.
Also, defendants clearly plagiarized the registered John Allan's
marks.  The mark Craig Allen's was intentionally used after defendants
visited John Allan's numerous time.

After reviewing the extensive media coverage and national sales
information, the court finds that John Allan's has secondary meaning
and is eligible for protection.

b.   Likelihood of Confusion

Plaintiff must also establish that a likelihood of confusion
exists between its mark and that of Craig Allen's.  The court will
again consider the factors of the likelihood of confusion test.  See
pp. 14 and 20, <u>supra</u>.

1.   Degree of Similarity

The court finds that this factor weighs slightly in favor of plaintiff.  The weight of the factor is not as strong since this mark does not include the similar logo design.

### 2.    Intent of Alleged Infringer[10]

Defendants knew that John Allan's was successful in New York which is at least some evidence that defendants purposefully used the mark Craig Allen's to take advantage of plaintiff's goodwill for a salon in Wichita, Kansas.  The fact that Craig Allen's was named after one of the partners, Craig Allen Tatro, seems too coincidental given defendants' purposeful copying of plaintiff's registered marks and other features of plaintiff's salons.

Therefore, the court finds that this factor weighs in favor of plaintiff.

### 3.    Consumer Confusion

After reviewing the testimony of the four customers, supra at 14-15, Alvarez and Wheeler were initially confused after seeing the logos.  Only Green's testimony provides some evidence of actual confusion based on the name alone that the companies were the same.  Green's inquiry, alone, cannot support a finding of actual confusion.  Jordache Enters., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1487 (10th Cir. 1987).  Moreover, based on Green's testimony, the court cannot conclude that Green was confused by the name of the salon but rather his questioning came after seeing the logo and the inside of John Allan's, which he testified was very similar to the inside of Craig Allen's.

---

[10] The legal standard is set out earlier in this opinion, supra at pp. 14-15.

The court finds that plaintiff has failed to establish actual confusion as to the John Allan's mark.  Therefore, this factor weighs in favor of defendants.

### 4.   Similarity of Services and Manner of Marketing

Again, as discussed supra at 14 and 20, the similarity of services weighs in favor of plaintiff, the manner of marketing those services weighs in favor of defendants, thus resulting in a neutral factor.

### 5.   Degree of Care

The court finds that the types of consumers who frequent men's salons like that of plaintiff's and defendants' exercise a somewhat high degree of care in selecting a salon for services.

The court finds that this factor is neutral.

### 6.   Strength or Weakness of Mark

To assess the relative strength of an unregistered mark, the court must consider both the conceptual and commercial strength.  King of the Mountain Sports, Inc., 185 F.3d at 1093.  "Under the conceptual strength prong, the categories, in descending order of strength, are: fanciful; arbitrary; suggestive; descriptive; and generic."  Id.  A generic term is ineligible for protection while a descriptive mark may be eligible for protection upon a showing that it "has acquired a 'secondary meaning' in the minds of the public."  Donchez v. Coors Brewing Co., 392 F.3d 1211, 1216 (10th Cir. 2004).  The other three categories are deemed inherently distinctive and entitled to protection.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 2757 (1992).

The court has already determined, supra at p. 23-25, that

plaintiff's mark John Allan's is descriptive and has attained secondary meaning.  Plaintiff asserts that the John Allan's name has significant commercial strength based on its history of sales, media coverage, longevity of use and intentional copying by defendants. (Doc. 98 at 18-19).  Plaintiff had $3 million in sales in 2005. Plaintiff markets products nationwide in approximately 144 department stores and salons.  (Exh. 142).  Plaintiff also offered numerous examples of articles that appeared in national publications.  (Exhs. 1, 2, 3, 116, 155, 156).  Plaintiff was featured on nationally televised programs.  (Exhs. 157, 158).  The court finds that the John Allan's mark has attained considerable commercial strength in the New York market and has some recognition in the national market.

This factor, therefore, weighs in favor of plaintiff.

c.   Conclusion

After reviewing all of the applicable factors, the court finds that a likelihood of confusion does not exist between the mark John Allan's and Craig Allen's.  While there is some similarity and John Allan's does have a protectable mark, the other factors are neutral or weigh in favor of defendants.  The court is reluctant to find that the use of Tatro's middle name, and a common one at that, violates plaintiff's mark without a stronger showing by plaintiff.  See Sardi's Rest. Corp. v. Sardie, 755 F.2d 719, 725 (9th Cir. 1985); see also Brennan's, Inc., 360 F.3d at 131-32.[11]

---

[11] In cases finding a violation of the plaintiff's trademarks, the courts enjoined the defendants from using the same surname unless the defendant also used another word or name to precede their surname. See Rosenthal v. Ritelite, Ltd., 986 F. Supp. 133, 145 (E.D.N.Y. 1997); Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1175 (2d Cir. 1976).

**2.   JA Circle Design**

While plaintiff has registered its mark John Allan's & JA circle design, the mark JA circle design, standing alone, has not been registered. Accordingly, plaintiff's claim for trademark infringement of the JA circle design will be evaluated as an unregistered trademark.

     

    a.   <u>Protectable trademark</u>

As stated earlier, <u>supra</u> at p. 21, a mark must either be descriptive with secondary meaning, suggestive, arbitrary or fanciful in order to be protectable under federal law.  <u>Sally Beauty Co.</u>, 304 F.3d at 975-76.

Since the mark is comprised of only initials in a circle logo, the court finds that this mark is not generic or descriptive, but rather arbitrary.  Arbitrary marks can consist of symbols that do not suggest or describe any quality or characteristic of the services. <u>Id.</u>

Plaintiff's mark is therefore entitled to protection.

---

Since both plaintiff and defendants use a first name in addition to the Allan/Allen name, the court finds that there is no likelihood of confusion.

b.   Likelihood of Confusion

The analysis <u>supra</u> at p. 9-16, is applicable to John Allan's claim of infringement for the JA logo.  Therefore, the court finds that a likelihood of confusion does exist between the JA circle logo and defendants' initial CA logo.

c.   Conclusion

Since plaintiff has a protectable mark and a likelihood of confusion exists, the court finds that defendants infringed on plaintiff's service mark JA circle logo by their now-discontinued use of the old CA circle logo.

C.   Trade Dress Infringement

Plaintiff's final claim against defendants alleges an infringement of plaintiff's trade dress in violation of section 43(a) of the Lanham Act.  Trade dress is the overall image and appearance of a product.  <u>Sally Beauty</u>, 304 F.3d at 977.  In order to succeed, plaintiff must establish (1) that its trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) likelihood of confusion; and (3) its trade dress is not functional. <u>Id.</u>

Plaintiff asserts that its trade dress is the "look and feel" of an old-world men's club and not a barber shop.  (Doc. 98 at 20). While the court could not find a case involving a men's salon, courts have recognized that an action for trade dress is sustainable in restaurant decor and image.  <u>See</u> <u>Two Pesos</u>, 505 U.S. at 768, 112 S. Ct. 2753; <u>Fuddruckers, Inc. v. Doc's B.R. Others, Inc.</u>, 826 F.2d 837 (9th Cir. 1987).  The Supreme Court has stated that a case that involves decor is akin to a product packaging case.  <u>Wal-Mart Stores,</u>

Inc. v. Samara Bros., Inc., 529 U.S. 205, 215, 120 S. Ct. 1339, 1345 (2000).  "The attribution of inherent distinctiveness to certain categories of . . . product packaging derives from the fact that the very purpose of . . . encasing it in a distinctive packaging, is most often to identify the source of the product." Id. at 212.

Plaintiff asserts that it seeks to only protect the trade dress of its Downtown and Midtown locations and not the salons in Saks and Tribeca.  Defendants respond that plaintiff cannot choose to pick elements of its trade dress from club locations and not the other two locations.

In Samara Bros., Inc. v. Wal-Mart Stores, Inc., 165 F.3d 120 (3d Cir. 2000), the Third Circuit stated that "there will be inevitable variation in the products."  The Samara Bros. case is distinguishable because it was about the plaintiff's product line and not the packaging of the product.  This case is "akin" to product packaging; plaintiff is selling essentially the same product at all of its locations; only the "packaging" of the product is not the same.

In Best Cellars Inc. v. Grape Finds at Dupont, Inc., 90 F. Supp.2d 431, 453 (S.D.N.Y. 2000), the court held that changes in some locations were insignificant.  However, the changes that occurred in the three different locations were not a part of the elements of trade dress sought to be protected by the plaintiff.  This was the reason the court found the difference to be insignificant.

Plaintiff relies heavily on Rose Art Indust., Inc. v. Swanson, 235 F.3d 165, 173 (3d Cir. 2000), for the proposition that a trial court should only consider the products or packaging for which the plaintiff is seeking trade dress protection.  Rose Art held, however,

that before a plaintiff can seek protection for product packaging that is different for an identical product the plaintiff must establish

> that the series or line has a recognizable and consistent overall look. Only after the plaintiff has established the existence of recognizable trade dress for the line or series of products should the trial court determine whether the trade dress is distinctive, whether the trade dress is nonfunctional, and whether defendant's use of plaintiff's trade dress is likely to cause consumer confusion. As such, we hold today that the District Court applied the correct legal standard when it required Rose Art first to show that the three packaging designs at issue, Primary Color Packaging, Neon Color Packaging, and Color Fade Packaging, each had a "consistent overall look." We agree with the District Court that "if a plaintiff seeking trade dress protection cannot show that its packages have a 'consistent overall look,' the trade dress that the defendant is allegedly infringing 'does not exist,' " and the defendant must prevail.

Id.

Accordingly, before a court considers whether the trade dress is distinctive, nonfunctional and creates a likelihood of confusion, it must determine whether plaintiff is seeking to protect a package that has a consistent overall look. Regal Jewelry Co., Inc. v. Kingsbridge Intern., Inc., 999 F. Supp. 477, 486 (S.D.N.Y. 1998)("Initially, this burden requires the plaintiff to articulate a specific trade dress, and then to demonstrate that it has, in fact, consistently used that trade dress.")(citing Life Industries Corp. v. Star Brite Distributing, Inc., 31 F.3d 42, 46, 50(2d Cir. 1994); Clinique Laboratories, Inc. v. Dep Corp., 945 F. Supp. 547, 559 (S.D.N.Y.1996); Walt Disney Co. v. Goodtimes Home Video Corp., 830 F. Supp. 762, 766 (S.D.N.Y. 1993)). "To recover for trade-dress infringement under § 43(a) of the Lanham Act, a party must first identify what particular elements or attributes comprise the protectable trade dress." Tumblebus Inc. v. Cranmer, 399 F.3d 754, 768 (6th Cir. 2005).

-32-

Throughout this case, plaintiff has consistently changed its list of trade dress elements.[12]  In the complaint, plaintiff asserted that its trade dress included the following:

1.   Formal traditional low leather chairs where patrons sit for haircuts and manicures

2.   Double sided mirrored dividers

3.   Miniature traditional wood dressers at the cutting stations

4.   Stools with wheels on which stylists/manicurists are seated

5.   Low tables for positioning drinks near the cutting stations

6.   Black cutting jacket and black valet aprons

7.   Bold and colorful hanging art

8.   Oriental-style rugs covering parts of the floor

9.   Comfortable plush leather-appearing chairs arranged in a club style for waiting patrons

10.  Frosted glass

11.  Nostalgic barber chairs for hot towels

12.  Shoe shine stands

13.  A pool table

14.  A cigar room and

15.  A circular logo prominently featured throughout the salon. (Doc. 1 at 22).

On January 3, 2006, in response to an interrogatory, plaintiff omitted the "plush leather-appearing chairs arranged in a club style for waiting patrons" and black valet apron elements and added the

---

[12] During the trial, plaintiff objected to defendants' request to admit 474, 475, 476, 477, 530, 531, for the purpose of establishing plaintiff's changing description of its trade dress.  With the exception of 476, plaintiff's objection is now overruled.

following, in addition to those stated in the complaint:

    1.   Bar and lounge

    2.   Televisions

    3.   Low-key music, particularly jazz, blues, funk, easy listening, R & B, soul and classic rock

    4.   Overhead electrical plugs for hair stylists

    5.   Manicure services provided simultaneously with haircuts

    6.   Pedicure services

    7.   Double-sided business cards

    8.   Separate treatment rooms for spa and pedicure services

    9.   Foot-soaking bucket for pedicure services

    10.  Hot towel treatments

    11.  Photographs of celebrities, including Frank Sinatra

    12.  Art shows

    13.  Use of the phrase "men's service rediscovered" and

    14.  Use of the phrase "return to a simpler time."

(Exh.. 477 at 6-7).

On January 11, 2006, plaintiff filed an amended set of interrogatory responses in which it added "soothing, low-tempo music" and black valet aprons and withdrew the following elements:

    1.   Low-key music, particularly jazz, blues, funk, easy listening, R & B, soul and classic rock

    2.   Pedicure services

    3.   Separate treatment rooms for spa and pedicure services

    4.   Foot-soaking bucket for pedicure services

    5.   Photographs of celebrities, including Frank Sinatra

    6.   Use of the phrase "men's service rediscovered" and

     7.    Use of the phrase "return to a simpler time."
(Exh. 530 at 6-7).

On February 1, 2006, plaintiff again supplemented its response to defendants' interrogatories and stated that its trade dress elements included the following:

     1.    Double-sided center haircutting stations

     2.    Club styled, leather chairs

     3.    Black cutting jackets with logos for patrons

     4.    Valet aprons with logo

     5.    Wheeled stools for the seating of stylists

     6.    Overhead electrical plugs for hair stylists

     7.    Shoe shine stand

     8.    Bar and lounge with billiard table

     9.    Private cigar room

     10.   Artworks displayed and offered for sale

     11.   Antique-style barber chairs for hot towel treatment and

     12.   Frosted glass interior and exterior windows etched with John Allan's logo.
(Exh. 531 at 4).

The pretrial order, filed on February 15, 2006, does not list the elements of trade dress for which plaintiff seeks protection. (Doc. 69 at 6-7). During trial, plaintiff asserted that its trade dress consists of the following: interior and exterior frosted glass with logo; club styled leather chairs for cuts; black cutting jackets; center cutting station; wood dressers at stations; stools for cutting; manicure during haircut; low table for drinks; old barber chairs; pool table; bar and lounge; cigar room; shoe shine stand, and; oriental

-35-

style rugs.  (Exh. 174).  Plaintiff's trade dress asserted at trial omitted the elements "overhead electrical plugs" and artwork from its list contained in the second supplemental interrogatory and added the following "new" elements to its list: wood dressers at stations; manicure during haircut; low table for drinks; and oriental style rugs.

In post-trial briefing, plaintiff does not specifically list its trade dress elements.  Throughout the brief, there are references to its "uniqueness" and "nonfunctionality."

> Indeed, John Allan's was intentionally designed to contain elements not found in a traditional hair salon, such as low-cut chairs, and to exclude traditional aspects of a barber shop, such as a striped pole. (Meing pp. 272, 275) Defendant Leschuk admitted that it was unusual to have a shoeshine stand, oriental rugs, black cutting jackets, low-cut leather chairs for haircutting services and frosted glass in such a business.

* * *

> Moreover, John Allan's trade dress is not by nature functional. For example, the club chairs that patrons sit in while receiving services make haircutting unusually difficult because they cannot be raised and lowered to bring the customer closer to the person giving the haircut. (Meing p. 274-75). Other elements, such as oriental rugs, a shoe shine stand, pool table and bar have nothing to do with facilitating haircutting.

(Doc. 98 at 20-21, 23).

However, plaintiff states the following when requesting injunctive relief:

> D.   An injunction prohibiting Defendants from using the John Allan's trade dress.

This can be effectuated by mandating that Defendants:

> i. remove the adhesive on the glass that gives it a frosted look;

> ii. change the color of their cutting jackets and

-36-

smocks;

       iii. replace their low-cut club chairs in which patrons sit while receiving service with traditional hair cutting chairs;

       iv. remove their center cutting stations; and

       v. remove their pool table.

(Doc. 98 at 29).

The requested injunctive relief leaves the court perplexed. Either plaintiff is unconcerned with defendants' use of certain elements of its trade dress or plaintiff is now creating a new list of trade dress elements. Plaintiff's briefing does not explain the changes in trade dress elements or reason as to why the injunctive relief requested does not cover all of the elements of plaintiff's alleged trade dress set forth during trial. For example, in its brief, plaintiff fails to discuss the distinctiveness or functionality of both the center cutting stations and smocks but yet seeks an injunction prohibiting defendants from using these items.

Throughout trial and briefing plaintiff continuously refers to its trade dress as the "look and feel of an old world men's club" but does not consistently refer to the elements that make up the club. The court cannot arbitrarily decide what an "old world men's club" must have looked like (assuming such clubs existed). "[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list." Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 634 (6th Cir. 2002).

When issuing injunctive relief, the court is to enjoin a

-37-

defendant from using a particular trade dress that is protectable under the Lanham Act.  <u>See</u> <u>Tumblebus Inc.</u>, 399 F.3d at 768.  The court cannot conclude that plaintiff has identified a protectable trade dress when plaintiff's description of its trade dress has continuously changed.  If plaintiff cannot determine which elements comprise its trade dress and require protection under federal law, the court cannot see how an alleged competitor or a consumer would be able to do so.

Accordingly, the court finds that plaintiff has failed to prove the elements of its trade dress which would be eligible for protection.  <u>Rose Art Indust., Inc.</u>, 235 F.3d at 173.

Even had plaintiff consistently represented a list of elements that comprise its trade dress, the court finds that plaintiff has failed to establish that it has maintained a consistent overall look in applying those trade dress elements.[13]  Unlike a consumer purchasing crayons in <u>Rose Art</u>, a consumer may pay one price, an annual membership, for the package of services at John Allan's.  There is no dispute that this purchase entitles the owner to privileges at all four John Allan's locations.  Basically, plaintiff is selling identical services with different packaging.  While <u>Rose Art</u> held that protection is possible for different packaging, the court finds that it is distinguishable from the case at bar due to the product that John Allan's is selling.

Moreover, John Allan's consistently advertises that its services of "an old world men's club" are available at every location.  John Allan's does not distinguish Saks and Tribeca in its advertising as

---

[13] In coming to this conclusion, the court has utilized the trade dress list of elements that plaintiff offered during trial.

the feel of a salon in a department store but rather consistently presents an image to the public that it will receive John Allan's treatment at all four locations.  Plaintiff cannot have it both ways.

Upon review of the exhibits displaying photographs of the four John Allan's locations and the testimony from individuals who visited all salons, the court finds that plaintiff has not consistently applied its alleged trade dress.  Accordingly, plaintiff's alleged trade dress is not entitled to protection.

**IV.   CONCLUSION**[14]

The court finds in favor of plaintiff on its claims against defendant for infringing on its marks John Allan's & JA circle logo, JA circle logo and "A RETURN TO A SIMPLER TIME."  The court finds in favor of defendants on plaintiff's claims of trade dress infringement and trademark infringement of the marks John Allan's, "MEN'S SERVICE REDISCOVERED."

**V.   RELIEF**

In its post-trial brief, plaintiff requests that this court enter an injunction prohibiting defendants from using the Craig Allen's name or any name that contains the name Allen's, using the Craig Allen's circular logo or any other logo that is confusing similar, using any other registered marks of plaintiff's and using plaintiff's trade dress.

At the time of trial, plaintiff's employees testified that defendants' current mark is not confusingly similar to that of

_____

[14] Defendants' motion to supplement the record (Doc. 96) is denied.

plaintiff's.  Moreover, use of the initial CA logo, the Craig Allen's & CA logo and the mark "A RETURN TO A SIMPLER TIME" was discontinued by defendants in June 2005.[15]

While the court may enter an injunction against any further use of these marks, the court finds it unnecessary.  Brunswick Corp., 832 F.2d at 525.  Defendants ceased using the marks approximately two years ago and expended more than $20,000 to effect the changes.  The court finds it highly unlikely, based on the testimony of trial, that defendants will return to using plaintiff's marks.  Plaintiff's request that defendants be enjoined from using the initial CA circle logo, the initial Craig Allen's & CA circle logo and the mark "A RETURN TO A SIMPLER TIME" is therefore denied.

Plaintiff's request that defendants be enjoined from using the name Craig Allen's and the mark "MEN'S SERVICE REDISCOVERED" is also denied since the court found that defendants' use of those marks have not infringed on plaintiff's protectable marks.  Since plaintiff has failed to establish that it has a protectable trade dress, plaintiff's request that defendants be enjoined from using its trade dress is denied.

Plaintiff also requests an award of attorney fees.  An award of attorney fees in trademark infringement actions is allowed only upon a determination that defendants' acts of infringement are in bad faith.  Nat'l Ass'n of Professional Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d 1143, 1148 (10th Cir. 2000).  However,

---

[15] The exact date of defendants' discontinued use is unknown. Based on testimony, the court believes that defendants removed the logo and the phrase after receiving the complaint in June 2005.

-40-

an award of attorney's fees is only provided in exceptional cases and the Tenth Circuit has "long held that an 'exceptional case' is one in which the trademark infringement is "malicious, fraudulent, deliberate, or willful." W. Diversified Servs., Inc. v. Hyundai Motor America, Inc., 427 F.3d 1269, 1273 (10th Cir. 2005). The court finds that this case is not an "exceptional case." Therefore, plaintiff is not entitled to attorney's fees.

Both parties seek an award of costs in this action. In order to make a ruling, the court requests that both parties submit briefs in support of their respective position. The briefs shall not exceed five pages and must be submitted by June 15, 2007. Both parties may file responses not exceeding three pages by June 22, 2007.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

-41-

IT IS SO ORDERED.

Dated this ___7th___ day of June 2007, at Wichita, Kansas.


                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE